STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ALBERT MAIER, DEFENDANT-APPELLANT.

Argued December 1, 1952—Reargued January 26, 1953 and March 3, 1953—Decided June 25, 1953.

*Mr. Walter R. Gottschalk* argued the cause for the appellant.

*Mr. Horace K. Roberson,* County Prosecutor, argued the cause for the respondent.

Mr. *Anthony P. La Porta* argued the cause for the intervenor complaining witness.

Mr. *Eugene T. Urbaniak*, Deputy Attorney-General, argued the cause for the Attorney-General, *amicus curiae.*

Mr. *Joseph Weintraub* argued the cause for the Sub-Committee on the Revision of the Criminal Laws to the Advisory Committee on the Revision of Statutes, *amicus curiae.*

The opinion of the court was delivered by

VANDERBILT, C. J. A complaint was made in the Municipal Court of Hoboken against the defendant Maier charging that "he did wilfully commit an assault and battery upon Frances Gianno by spitting upon the face and body of said Frances Gianno, all in violation of the Disorderly Persons Law, N. J. S. 2A:170–26," which is a new section, enacted December 5, 1951, reading as follows:

"Any person who commits an assault or an assault and battery is a disorderly person."

This section of the *New Jersey Statutes* must be considered in the light of *N. J. S.* 2A:85–1, which provides:

"Assaults, batteries, false imprisonments, affrays, riots, routs, unlawful assemblies, nuisances, cheats, deceits, and all other offenses of an indictable nature at common law, and not *otherwise* expressly provided for by statute, are misdemeanors." (Emphasis supplied.)

It is important to note that this section reads exactly like its predecessor *R. S.* 2:103–1, except for the insertion in *N. J. S.* 2A:85–1 of the word "otherwise," which obviously refers to *N. J. S.* 2A:170–26, which does "otherwise expressly provide by statute" for assaults and assaults and batteries.

The defendant moved to dismiss the complaint on the ground that *N. J. S.* 2A:170–26 was unconstitutional in that it violated three paragraphs of our Bill of Rights:

"No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except * * * in cases now prosecuted without indictment * * *." *Const., Art.* I, *par.* 8.

"The right of trial by jury shall remain inviolate * * *." *Const., Art.* I, *par.* 9.

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury * * *." *Const., Art.* I, *par.* 10.

The municipal court denied the motion to dismiss the complaint.

Because of the public importance of the matter we granted defendant's petition for certification. Procedural objections have been raised as to whether the case is ripe for appeal, but because of the number of cases in the several counties involving the same question, we deem it essential to proceed at once to the meritorious question, especially as the case has been extensively argued three times.

The intent of the Legislature in enacting *N. J. S.* 2A:170–26 and 2A:85–1 is known to all, for the matter was canvassed in a comprehensive report submitted to the Judicial Conference by its Committee on Improving the Administration of Criminal Justice and was debated in the Judicial Conference, of which the legislative leaders as well as the judges and representatives of the bar are members, *Rule* 1:7–3. Thereafter it was again the subject of a study by the Subcommittee on the Revision of Criminal Laws which reported to the Advisory Committee on the Revision of Statutes created by *L.* 1950, *c.* 171, which in turn made the report to the Legislature on which is based the revision of *Title* 2 of the *Revised Statutes*, of which the statutes in question, *N. J. S.* 2A:170–26 and 2A:85–1, are parts. Together, these two sections purport to make the conduct that theretofore constituted the crimes of simple assault and of simple assault and battery; *R. S.* 2:103–1, disorderly conduct instead of misdemeanors. It is apparent that *N. J. S.* 2A:85–1 was cast in this form in order that the State might not be without a general statute relating to assaults and

batteries in the event that *N. J. S.* 2*A*:170–26 should be declared unconstitutional.

But the Legislature, by enacting *N. J. S.* 2*A*:170–26 and 2*A*:85–1, manifestly did not intend to make all assaults and batteries mere disorderly conduct, for it carried over into *Title* 2*A* three sections from *Title* 2 of the *Revised Statutes* relating to assaults and batteries:

> "Any person who commits an atrocious assault and battery by maiming or wounding another is guilty of a high misdemeanor." *N. J. S.* 2A:90–1, formerly *R. S.* 2:110–1.
>
> "Any person who commits an assault with intent to kill, or to commit burglary, kidnapping, rape, robbery or sodomy, or to carnally abuse a female under the age of 16, with or without her consent, is guilty of a high misdemeanor * * *." *N. J. S.* 2A:90–2, derived from *R. S.* 2:110–2.
>
> "Any person who willfully or maliciously assaults another with an offensive weapon or instrument, or by menaces, force or violence demands of another any money or personal goods and chattels, with intent to rob such other person, is guilty of a high misdemeanor." *N. J. S.* 2A:90–3, derived from *R. S.* 2:110–3.

 These three kinds of assaults and batteries constituting high misdemeanors are differentiated from each other, *N. J. S.* 2*A*:90–1 by the vicious act, *N. J. S.* 2*A*:90–2 by the evil purpose of the defendant, and *N. J. S.* 2*A*:90–3 by the use of offensive weapons or threats of violence. Taken together they present a comprehensive legislative scheme for assaults and assaults and batteries of a more grievous sort clearly distinguishable from simple assaults and batteries. The very substantial sanctions attached to these three high misdemeanors (in the case of *N. J. S.* 2*A*:90–1 and *N. J. S.* 2*A*:90–3 a fine of not more than $2,000 or imprisonment for not more than 7 years, or both, *N. J. S.* 2*A*:85–6; in the case of *N. J. S.* 2*A*:90–2, a fine of not more than $3,000 or imprisonment for not more than 12 years, or both), are to be contrasted to the punishment formerly attached to the crime of simple assault and battery of a fine not exceeding $1,000 or by imprisonment not exceeding 3 years, or both, *R. S.* 2:103–6, and to that which is now imposed on assault and battery as disorderly conduct of not more than one year's

imprisonment in a county workhouse, penitentiary or jail, or a fine of $1,000, or both, *N. J. S.* 2*A* :169–4. Clearly the Legislature, when it provided that "Any person who commits an assault or an assault and battery is a disorderly person," *N. J. S.* 2*A* :170–26, was providing for simple assaults and batteries as distinguished from the serious crimes provided for in the three sections of the statutes which we have just discussed. The Legislature might have interposed between simple assault and simple assault and battery as disorderly conduct and the three kinds of high misdemeanors above referred to, the intermediate offense of assault and assault and battery of general scope as misdemeanors distinguished by definition on the one hand from disorderly conduct and the three kinds of high misdemeanors on the other, and there is much that might be said for such a gradation in an offense of such a wide range as assault and battery, but the Legislature has not yet done so except in the limited instances of assaults on public officers in the service of process, *N. J. S.* 2*A* :99–1, and of assaults on news photographers and news reporters, *N. J. S.* 2*A* :129–1, and accordingly this problem is not now before us.

These gradations of assault and of assault and battery were unknown to the common law, *Rell v. State*, 136 *Me.* 322, 9 *A. 2d* 129, 125 *A. L. R.* 602 (*Sup. Jud. Ct.* 1939), 2 Burdick, *The Law of Crime* (1946), *sec.* 345, although by statute some assaults and assaults and batteries were punished more severely than others by reason of the victim being a cleric or a member of the royal household or because the crime was committed in a church or a church yard, a court of justice or a royal palace, 5 and 6 *Edw. VI, c.* 4. But aside from the position of the aggrieved person or the place where the crime was committed, there was at common law no differentiation in degrees of these crimes. Not only were there no degrees of assault or of assault and battery at common law, but they were crimes of very extensive scope and application designed to protect the individual from every kind of bodily harm or the fear thereof short of death. Assault covered every "attempt or offer with force and violence, to do a

corporal hurt to another," 1 *Hawkins, Pleas of the Crown,* 113. Blackstone defines it as "an attempt or offer to beat another, without touching him," 3 *Commentaries* 120, while according to Wharton it is "an apparent attempt by violence to do corporal hurt to another," 1 *Criminal Law* (10th ed.), sec. 603. On the other hand a battery is a "consummated or completed assault," 2 Burdick, *The Law of Crime, sec.* 350. It necessarily includes an assault. The offense is usually referred to as an assault and battery and at common law meant any unlawful bodily harm done to another person. "It seems that any injury whatsoever, be it never so small, being actually done to the person of a man, in an angry, or revengeful, or rude, or insolent manner, as by spitting in his face, or any way touching him in anger, or violently justling him out of the way, are batteries in the eye of the law." 1 Hawkins, *Pleas of the Crown,* 134. "The law cannot draw the line between different degrees of violence, and therefore totally prohibits the first and lowest stage of it; every man's person being sacred, and no other having right to meddle with it, in even the slightest manner." 3 *Blackstone's Commentaries* 120. Assault and battery at common law ranged from these minor offenses, which nevertheless the law cannot afford to overlook, to violence falling just short of manslaughter or murder.

The common law of assault and of assault and battery as well as the statutory system of assaults and assaults and batteries were well known to the committees heretofore mentioned, to the Judicial Conference of which the legislative leaders were members where it was debated, and to the Legislature itself. All realized the gravity of the problem presented. To state it succinctly, before the enactment of *N. J. S.* 2A:170-26 it was thought that every assault and every assault and battery could be proceeded against only by an indictment of a grand jury and a trial by a petit jury in exactly the same manner as the most serious crimes known to our law, unless, of course, the defendant saw fit, where the statute permitted it, to waive his constitutional right to indictment and trial by jury, *R. S.* 2:219-33. But there

are many assaults and many assaults and batteries which, though they constitute an inexcusable invasion of the rights of the individual citizen aggrieved thereby, have long seemed to the members of busy grand juries to be relatively unimportant in comparison with such crimes as murder, robbery and rape, that come before them for attention in all too numerous complaints. There has therefore been a perfectly natural tendency for relatively unaggravated assaults and assaults and batteries to go unredressed in many instances through the failure of the grand jury to indict the offenders, largely by reason of its preoccupation with more serious offenses, although there can be no doubt that the unwillingness of grand jurors to stigmatize their fellow citizens as criminals for a slight offense is also a factor. The resulting failure to indict is not only unfair to the individual citizen whose right of personal security from physical molestation and fear has been invaded without the redress that the law contemplated would be accorded him; it also makes, on the one hand, for continuing lawlessness on the part of the unpunished offenders and many who witness their flaunting of the law and, on the other hand, it makes for fear as to their personal safety as well as for a lack of respect for the law on the part of the victims of this failure of the judicial process and of other peaceloving members of the community. This maladministration of criminal law cannot fail to be highly detrimental to any neighborhood in which it occurs, and although it may seem relatively unimportant in comparison with the lurid crimes that find their way into the headlines of the newspapers, there can be little reason to doubt that collectively these seemingly minor infractions of the law, because of the frequency of their occurrence and the accumulative effect of their going unpunished, present a major problem in the administration of criminal justice, if the fundamental objectives of the law for the maintenance of peace and order are to be achieved.

There can be little doubt of the desirability of *N. J. S.* 2A :170–26. The only question before us is whether or not it contravenes *paragraphs* 8, 9 and 10 of *Article* I of our

*Constitution* relating to indictment by a grand jury and trial by an impartial jury. To resolve this question requires: (1) a study of the summary jurisdiction of the justice of the peace at common law, especially with respect to trespasses; (2) a study of the growth of legislation enlarging the jurisdiction of the justices of the peace and of the municipal magistrates in summary proceedings, especially under the Disorderly Persons Act, *N. J. S.* 2A :170–1 *et seq.*, and (3) an examination of the scope of the three quoted constitutional provisions.

## I. The Summary Jurisdiction of the Justice of the Peace at Common Law.

The general problem confronting us is not limited to New Jersey; it is a universal problem in the administration of justice. In every jurisdiction it is necessary to provide the machinery for the effective punishment in summary fashion of minor offenses and breaches of the peace that fall far short of being crimes which require more formal treatment. At common law this was the province of the justice of the peace. The keeping of the king's peace was one of the chief responsibilities as well as one of the great prerogatives of the crown. Prior to 1327 it was exercised by judges, sheriffs, coroners and constables, *Lambard, Eirenarcha, pp.* 3–22 (1607), 3 Burns, *Justice* (1793 *ed.*), *pp.* 2–4. The office of the justice of the peace had its origin in that year in the establishment of local conservators of the peace, by virtue of 1 *Edw.* 3, *c.* 16, which enacted that "in every county, good men and lawful, which shall be no maintainers of evil, or barretors in the country, shall be assigned to keep the peace." At first their authority was purely ministerial, paralleling that of the local constables. Gradually, however, they were granted judicial powers, and according to *Lambard, Id.* 23, after the passage of 32 *Edw.* 3, *c.* 1, they became known as justices. In 1360, by 34 *Edw.* 3, *c.* 1, they were given authority to "hear and determine at the king's suit all manner of felonies and trespass done in the same county."

2 Hawkins, *Pleas of the Crown, p.* 38; 1 *Stephens, History of the Criminal Law of England* 113 (1883). But it is clear that their primary duty was to keep the peace and that the powers gradually accorded them were merely in addition to their basic powers as conservators, 3 Burns, *Justice* (1793 *ed.*), *p.* 10. The authority granted by 34 *Edw.* 3, *c.* 1, to hear and determine trespasses included a wide variety of offenses. Sergeant Hawkins says that the word trespass "is a word of very general extent, and in a large sense not only comprehends all inferior offenses, which are properly and directly against the peace, as *assaults and batteries* and such like, but also all others which are so only by construction; as all breaches of the law in general are said to be.", 2 *Pleas of the Crown* 40. (Emphasis supplied) He goes on to say that all of these arise out of and were directly connected with the justices' duty to preserve the peace:

"* * * inasmuch as the chief end of the institution of the office of these justices, was for the preservation of the peace against personal wrongs, and open violence; and the word trespass in its most proper and natural sense, is taken for such kind of injuries, it shall be understood in that sense only in the said statute and commission, or at the most to extend to such other offences only as have a direct and immediate tendency to cause such breaches of the peace; * * *." 2 *Id.* 40.

Similarly in Bacon's *Abridgement,* which Sir Henry Maine has termed "our classic English digest," the distinguished author in speaking of "inferior offenses" says:

"And therefore, it hath been held, that not only *assaults and batteries,* but libels, barretry, and common nightwalking, and haunting bawdy-houses and such like offences, which have a direct tendency to cause breaches of the peace, are cognizable by justices of the peace, as trespasses within the proper and natural meaning of the word. * * *" 3 Bacon, *A New Abridgement of the Law* (4th *ed.* 1778), 292. (Emphasis supplied.)

The significance of the jurisdiction of the justice of the peace over all forms of trespass, including assault and battery, is explained in 2 *Holdsworth, History of English Law* 364 (1923):

"This action [trespass] in Edward I's reign was a quasi-criminal proceeding, *i. e.*, though it was a proceeding begun at the suit of the injured individual, it was aimed at serious and forcible breaches of the peace, and it ended in the punishment of the defendant as well as in compensation to the plaintiff. * * *

A trespass, then, in Edward I's reign is a tort insofar as it is begun by an action of the injured individual—but it is of a criminal nature. A man can be ·punished for his trespasses by the court which tries the action * * *. It is to the mixed character of this action—to its penal and its reparatory sides—that we must look for the growth of the misdemeanor on the one side, and, on the other, for a form of civil action which will supplement the deficiencies of our early law of tort * * * when the general eyre declined and the itinerant justices confined themselves mainly to legal business, when the justices of the peace took over the smaller criminal business, it is felonies and 'trespasses' which will be presented to them for trial; and it is the trespasses so presented which will become the misdemeanors of our later law."

It is important to keep in mind the dual nature of trespasses, including assaults and batteries, especially when we come to examine the entries in the diary of William Hunt, justice of the peace for the County of Wilts (1744–1748).

By 11 *Hen.* 7, *c.* 3, the justices of the peace were empowered to "hear and determine all offenses and contempts" except felonies on information. Under this statute trials were had without indictment, presentment or jury, 4 *Coke Inst.* 41. This particular statute provoked so much discontent that it was repealed on the death of Henry VII, 1 *Hen.* 8, *c.* 6. But though the jurisdiction of the justices of the peace over all offenses and contempts except felonies was repealed, the steady growth in the number and variety of summary penal proceedings without indictment or trial by jury before one or more justices of the peace hereinbefore noted continued throughout the 18th Century. Writing of the 18th Century, Holdsworth says:

"We have seen that the stream of statutes, which gave to the justices of the peace their position of decisive importance in the government of the counties and the boroughs, had begun to flow in the Tudor period. That stream increased in volume right down to the nineteenth century. It not only added to and elaborated the duties imposed on many of the minor officials of the local government, such as constables, overseers, and surveyors of high-

ways. Throughout the eighteenth century, the working and inter-
pretation of these statutes by single justices or pairs of justices,
under the supervision of quarter sessions and the courts of common
law, was creating new law and elaborating much old law on many
different topics, which were more or less closely related to the
topic of local government.

The primary duty of the justices was to keep the peace. That
always must be the earliest and most permanent duty of officials
entrusted with the powers of government, local or central. There-
fore there was, from the first, a close connection between local
government and the criminal law; and that connection was main-
tained long after the government had undertaken other tasks be-
sides its primary task of keeping the peace. The many statutes
which regulated the activities of citizens, which imposed obliga-
tions pecuniary or personal upon them, which organized public
services, such as poor relief or road maintenance, necessarily pro-
vided for the punishment of those who disobeyed them. Therefore,
whilst enlarging the governmental powers of the justices, they, at
the same time continually enlarged their criminal jurisdiction.
Since the criminal law, both substantive and adjective, had come
to be a very technical body of law, the enforcement both of the
old common law rules and of the new statute law, was no easy
matter. Substantial justice must be done; but if that substantial
justice was not done in conformity with the rules of a very technical
system, the justices might easily expose themselves to personal
liability.

A catalogue of the statutes which enlarged the jurisdiction of
the justices, criminal or otherwise, would include a very large pro-
portion of the statutes passed during the eighteenth century. Such
a catalogue, however arranged, would be useless, since it would omit
the common law rules, substantive and adjective, which those
statutes presuppose, and the interpretation put upon these com-
mon law and statutory rules by the courts." 10 *History of English
Law* 159-160 (1938).

Sidney and Beatrice Webb in their *English Local Govern-
ment, vol.* 1 (*The Parish and the County*), 418, 419, give
an even more specific account of the work of the justice of
the peace outside of the quarter sessions:

"Their criminal jurisdiction ranged from the smallest misdemeanor
penalized by a shilling fine, such as the utterance of an oath or
the commission of a trivial statutory nuisance, up to the grave
offenses of incorrigible vagabondage, rick-burning, or the killing of
game, for which severe corporal punishment, a long term of im-
prisonment, or even in one case, seven years transportation could
be inflicted. * * *

Yet there was no provision for any trial by jury or for the
publicity of an open court. Even in prosecutions under such drastic

penal statutes as those relating to vagrancy and the preservation of game, the 'Single Justice' or the 'Double Justice' heard the case whenever he chose, without necessarily admitting the public, or even the defendant's attorney; took whatever evidence he deemed necessary, and himself decided both law and fact."

In referring to the diary of William Hunt, a justice of the peace for the County of Wilts for the years 1743–1748, they state:

"We see him doing something every two or three days, granting warrants and summonses, signing parish accounts, swearing persons to affidavits, issuing certificates and passes of one sort or another, disposing of petty cases of bastardy, *assault*, 'hedge-pulling' and non-payment of wages * * *." *Id.*, 389 (Emphasis supplied.)

■■ An examination of the entries in this diary dealing with assault and assault and battery reveals very clearly the dual nature of these offenses which Holdsworth has appropriately termed both torts and crimes, 2 *Id.*, 364, *supra*. In many instances the parties agreed on the damages with the justice's consent either before or after hearing. Occasionally, however, we find an entry showing summary punishment:

31 Oct., 1744. Granted a warrant against Benjamin Lewis of Markett Lavington, for violently assaulting of Edward Ivey of the parish of Burbidge, sheriffs baylief, complainant. Upon hearing the evidence of William Bell and William Bishop was so clear against him that I committed him to the Bridewell at Devizes."

In England "bridewell" is a term applied to "a house of correction; loosely a jail or prison." *Webster's New International Dictionary.* Another example is:

"21 May, 1745. Granted a warrant on the complaint of Mary Draper of Easterton, for an assault upon her by Elizabeth Plank, Mary Draper, Sarah Draper, Mary Draper junior and Elizabeth Jarvis, all of Easterton; upon a hearing the said complaint their mittimus was made to the house of correction, but afterwards were released by consent of the parties, paying charges."

A "mittimus" in English criminal practice was "a precept in writing, issuing from a court or magistrate, directed to the

sheriff or other officer commanding him to convey to the prison the person named therein, and to the jailer, commanding him to receive and safely keep such person until he should be delivered by due course of law." *Black's Law Dictionary* 1153.

Occasionally we find instances where the justice of the peace held the defendant for the quarter session:

"6 July, 1745. Granted a warrant at the complaint of Richard Smith of Market Lavington, butcher, against John Kyle of Easterton, labourer, for assaulting him in the execution of his office of tithingman. I bound him over to the Quarter Session at Marlborough and indicted."

"29 July, 1746. Granted a warrant on the complaint of Thomas Hutchins of Earl Stoke against Edmund Matthews of the same, labourer, for an assault; upon his appearing I bound him over to the Quarter Sessions at Marlborough."

"17 Nov., 1746. Granted a warrant at the complaint of Jane Naish (wife of James Naish of Bulkington, yeoman) against her said husband James Naish on oath for assaulting, beating and abuseing Jane Naish his said wife, without giveing him any sort of provocation, for which she desired the said James Naish to find sureties of the peace, not out of any malice, hatred, evil will or revenge, but purely for the preservation of her person from danger and harm; upon hearing thereof the said James Naish was bound with sureties to appear at the next General Quarter Sessions to answer the premisses aforesaid."

Nor were these the only methods used by the justice of the peace in disposing of complaints of assault and battery. In addition to dismissals where the evidence did not warrant judicial action, we find that cases of assault were disposed of by the defendant's "promise of his good behavior in the future," "promising to receive his wife again and using her better for the future," entering into "a bond penalty of one hundred pounds, never to molest John Biggs and his wife any more," "upon the appearing of the parties they entered into bonds of each side never to offend each other on the penalty of one hundred pounds," "the defendant giving a note of hand not to strike the complainant any more." Sometimes the justice adjudged civil damages and waived criminal prosecution:

"4 March, 1745/6. Granted a warrant on the complaint of Henry Franklyn Esqr. of the parish of Worton against Robert Jones of Market Lavington, for assaulting and beating him upon the King's highway. Upon hearing it I found his abuse so great, that I adjudged the said Jones to pay Mr. Franklyn four pounds and 4 shillings and all charges of prosecution, which he did accordingly, and Mr. Franklyn forgave him."

The English practice of handling assaults and assaults and batteries from the simplest cases to the more grievous ones illustrated by the diary of Justice Hunt was codified for the first time in 9 *Geo*. 4, *c.* 31 (1828), dealing with various offenses against the person. Section 27 authorized summary proceedings before two justices of the peace for common assaults and batteries on penalty of a fine not exceeding five pounds or two months imprisonment on default of such payment. Section 29 gave the justice of the peace the right not to adjudicate the controversy if "from any other circumstance" it appeared to him to be "a fit subject for prosecution by indictment." There can be no doubt but that by "common assaults and batteries" was meant what we in this State have called "simple assaults and batteries," as distinguished from the high misdemeanors set forth in *N. J. S.* 2A :90-1, 2, 3, *supra*. England met the problem of the broad range of assaults and of assaults and batteries by leaving to the determination of the justice of the peace whether the suit should be a summary one without indictment and trial by jury or one that he should submit to the grand jury for indictment and if indictment were found, to be followed by trial by jury. New Jersey has met the same basic problem by treating as disorderly conduct the acts which heretofore would have constituted the crime of assault or assault and battery, leaving for indictment and trial by jury the special kinds of assault and battery comprehended within the three kinds of high misdemeanors just referred to, thus sparing the defendant in the cases treated as disorderly conduct from the personal disgrace of a criminal record and all of the social and business disadvantages which flow from a criminal conviction, including the loss of his right to continue to hold any public office he then occupied, *N. J. S.*

2$A$:135–9, or to qualify for a civil service position, $R$. $S$. 11:9–6, $R$. $S$. 11:23–2, or the right to serve as a juror, $N$. $J$. $S$. 2$A$:69–1. In any event, there can be no doubt of the power of the justice of the peace at common law before 1776 to punish common or simple assaults and assaults and batteries summarily without presentment or indictment and without trial by jury.

## II. The Growth of Summary Proceedings, Especially Under the Disorderly Persons Act

Broad though the jurisdiction of the justice of the peace was at common law both before and after 1776, it nevertheless was no more extensive than that of his modern successor, the municipal magistrate, embracing as it does the many violations of the motor vehicle and traffic laws, of the fish and game laws, of the ordinances of each municipality, of the disorderly persons law, of *chapters* 1 and 4 of the Poor Law (*R. S., Title* 44), of *chapters* 6 and 17 of *Title* 9 relating to children, of *article* 4 of *chapter* 5 of *Title* 30 relating to institutions and agencies, and "Offenses of a lesser grade or degree than a misdemeanor or as to which no indictment by a grand jury is required," *N. J. S.* 2$A$:8–21. Each of these sources of the municipal magistrate's jurisdiction relates to offenses far too numerous to catalog. The Disorderly Persons Act alone, with which we are especially concerned, *N. J. S.* 2$A$:170–1 *et seq.*, consists of 96 sections, many of which deal with offenses far more serious in nature than simple assault and battery. The magnitude at the local level of the jurisdiction over disorderly persons can best be comprehended by enumerating the titles of the offenses proscribed in the successive sections of the act, but before listing them two observations spring to mind, both of which are pertinent to our present inquiry:. (1) how could our courts of general criminal jurisdiction possibly function effectively in our complicated urban civilization of today if they had exclusive jurisdiction over all of these offenses either with or without a jury; (2) how many of these offenses smack

of common-law crimes or involve elements of them or are specialized instances of more general crimes? The wide sweep of the act appears from its table of contents:

"ARTICLE I. CERTAIN DISORDERLY PERSONS ENUMERATED.

Sec.

2A:170–1. Persons unable to give good account of themselves or engaged in illegal occupation, and in state for unlawful purpose; consorting with criminals.

2A:170–2. Common thieves, burglars and pickpockets.

2A:170–3. Carrying weapons or burglar tools with intent to break and enter or assault; presence in or near buildings or other places with intent to steal.

2A:170–4. Paupers, beggars and idlers.

2A:170–5. Prostitution; soliciting unlawful sexual or indecent acts.

2A:170–6. Diseased person having sexual intercourse.

2A:170–7. Fortune tellers.

2A:170–8. Use of narcotic drugs.

2A:170–9. Giving false alarm.

2A:170–10. Spitting.

2A:170–11. Air-raid shelter; refusal to admit or permit to remain.

2A:170–12. Alien not to act as detective.

2A:170–13. Driving horse while intoxicated.

2A:170–14. Abuse of animals or vehicles hired from livery stables.

2A:170–15. Marathons, etc., advertising, conducting or performing in; exceptions.

2A:170–16. Mercury; use in treating hatters' fur, etc.

2A:170–17. Persons possessing ammunition, explosive missiles, fuses, etc., to notify police; presentation for inspection.

2A:170–18. Possession of lottery or numbers slips.

2A:170–19. Persons representing themselves to be members of armed forces or auxiliaries; wearing insignia to induce belief of former membership therein.

2A:170–20. Soliciting funds for law enforcement organizations; venue of offense.

2A:170–21. Removing or injuring notices or advertisements.

2A:170–22. Deposit of refuse of chemical manufactories.

2A:170–23. Refusal or neglect to bury offensive matter.

2A:170–24. Burial of poultry or animals dying of contagious diseases.

2A:170–25. Exposure of others to infection of certain diseases; exceptions.

2A:170–25.1 Marihuana; growing or allowing to grow on one's land.

ARTICLE 2. ASSAULT AND BATTERY; PUBLIC DISTURBANCES.

2A:170–26. Assault; assault and battery.

2A:170–27. Fighting.

Sec.

2A:170–28. Disturbing assemblies.
2A:170–29. Offensive language; molesting or interfering with persons.
2A:170–30. Loitering or creating a disturbance while under the influence of intoxicating liquor.

ARTICLE 3. TRESPASSING; INJURY TO REAL AND PERSONAL PROPERTY.

2A:170–31. Trespassing; penalty.
2A:170–32. Removing or defacing posted notices against trespassing.
2A:170–33. Unlawful dumping of junk on private property.
2A:170–34. Trespassing with horses and hounds.
2A:170–35. Cutting, destroying or removing trees or timber on land of another without owner's consent; exception.
2A:170–36. Malicious injury to property.
2A:170–37. Malicious mischief.
2A:170–38. Unlawful taking of motor vehicle.
2A:170–39. Poisoning domestic animals.
2A:170:40. Temporary taking of horses.
2A:170–41. Unauthorized use of plays and operas.

ARTICLE 4. FRAUDS AND MISREPRESENTATIONS.

2A:170–42. Untrue and misleading advertisements.
2A:170–43. Obtaining valuable thing from state, municipality, charitable organization or association by false statement.
2A:170–44. Obtaining free hospital treatment by misrepresentation.
2A:170–45. Renting motor vehicle with intent to defraud; evidence of intent.
2A:170–46. Damaging rental motor vehicle mileage registering instrument; evidence of intent to defraud.
2A:170–47. Defrauding hotel or restaurant keeper or hospital; evidence of intent.
2A:170–48. False statements concerning hotels or lodging houses.
2A:170–49. Obtaining property or service by fraudulently operating coin receptacles.
2A:170–50. Hiring horses or wagons by deceit.

ARTICLE 5. MINORS.

2A:170–51. Sale of cigarettes, cigarette papers or tobacco to minors.
2A:170–52. Permitting minors in theaters.
2A:170–53. Permitting minors in dance halls.
2A:170–54. Permitting minors in pool rooms or permitting them to gamble therein.

ARTICLE 6. DISORDERLY ACTS RELATING TO PUBLIC UTILITIES, CONVEYANCES, ROADS, AND OTHER PUBLIC PROPERTY.

2A:170–55. Failure to pay fare on public conveyance.
2A:170–56. Definitions pertaining to section 2A:170–57.

Sec.

2A:170–57. Sale, procurement, etc., of passage ticket, reservation or passenger accommodation above established tariff charge.

2A:170–58. Jumping on or off trains.

2A:170–59. Trespassing on railroad trains or property; penalty.

2A:170–60. Shooting or throwing objects at vehicles; placing objects on tracks; taking coal from cars or tracks.

2A:170–61. Unauthorized interference with running of trains.

2A:170–62. Displaying red light near grade crossing; exceptions.

2A:170–63. Fraudulently tapping electric wires, or gas or water meters or pipes; presumptive evidence.

2A:170–64. Tampering or connecting with electric meters; presumptive evidence.

2A:170–65. Smoking in bus or trolley car.

2A:170–66. Using closed highway or road; removal of warning signals; violating highway regulations.

2A:170–67. Erecting signs or encroachments on highways without permission.

2A:170–68. Defacing public bridges or laying wires or pipes thereon without permission.

2A:170–69. Destroying apparatus of the United States volunteer lifesaving corps; interfering with or deceiving lifesavers.

ARTICLE 7. SALES, PURCHASES, DISPLAYS AND UNAUTHORIZED ADVERTISEMENTS.

2A:170–70. Selling tickets in excess of established price.

2A:170–71. Sale, etc., of containers bearing name or trade-mark of advertised or standard nationally advertised face lotion, etc.

2A:170–72. Preparation, sale, etc., of substitute face lotions, etc., under name or in containers of trade-marked, advertised or standard nationally advertised products.

2A:170–73. Purchase or sale of goods 'not to be sold.'

2A:170–74. Sale or use of inflammable paper balloons.

2A:170–75. Soliciting sale of funeral wreaths, etc.

2A:170–76. Uttering or exposing to view instruments, medicines, etc., to prevent conception or procure abortion.

2A:170–77. Unauthorized placing of circulars or advertisements in newspapers or periodicals.

2A:170–77.1. Sale, offering for sale or possession of hypodermic needle for narcotic drugs.

ARTICLE 8. PRACTICE OF LAW; SOLICITING ACTIONS AND CLAIMS; SIMULATING COURT PAPERS.

2A:170–78. Practice of law limited to licensed attorneys or counselors at law.

2A:170–79. Unlicensed persons not to appear as attorney or solicit law business.

Sec.
2A:170–80. 'Practice' includes preparation of wills and deeds.
2A:170–81. Business and practices excepted.
2A:170–82. Further exceptions.
2A:170–83. Unlicensed persons soliciting suits on contingent fee basis.
2A:170–84. Soliciting business for collection agencies upon an annual basis, or for definite time.
2A:170–85. Soliciting commencement of actions for injuries or negligence.
2A:170–86. Papers simulating summons, complaint, writ or process; printing or circulating.
2A:170–87. Imitating court process.

ARTICLE 9. CORRUPTION OF EMPLOYEES.
2A:170–88. Corruption of agents, employees or servants; corporate agents punishable individually.
2A:170–89. Immunity from prosecution under section 2A:170–88.
2A:170–90. Employment by 'kickback.'

ARTICLE 10. RENTALS OF PROPERTY AND INJURIES THERETO.
2A:170–91. Bonus in connection with rental of property under rent control.
2A:170–92. Discrimination against children in renting houses.
2A:170–93. Injuries to or destruction of property by tenant.

ARTICLE 11. IDENTIFICATION CARDS AND BADGES.
2A:170–94. Identification card or badge for employees or visitors; failure to surrender when required.
2A:170–95. Finder of identification card or badge; surrendering it to nearest police station required; failure to do so.
2A:170–96. 'Identification card' and 'identification badge' defined."

The Disorderly Persons Act has had a long history, though its growth for 65 years was slow. It originated in *L.* 1799, *c.* 3, *Paterson's Laws* 410, *section* 1, thereof providing that:

"All paupers, who shall unlawfully return to the city or township, from which they were legally removed, without a certificate from the city or township, to which they belong, or who shall leave their places of legal settlement; and all persons, who shall go about from door to door, or place themselves in streets, highways or passages, to beg, crave charity, or collect alms, or who shall wander abroad and lodge in taverns, inns, beer houses, out houses, houses of entertainment, market houses, barns or other places, or in the open air, and not give a good account of themselves, or who

shall wander abroad, and beg or solicit charity, under pretence of being or having been soldiers, mariners, or seafaring men, or of loss by fire, or other casualty, or of loss by the Indians, or by war, or other pretence or thing; and all persons, who shall leave, or threaten to leave their families to be maintained by the city, township or county, or to become chargeable thereto, or who, not having sufficient property or means for their subsistence or support, shall live idle, or not engage in some honest employment, or not provide for themselves or families; and all persons, who shall use, or pretend to use, or have any skill in physiognomy, palmistry, or like crafty science, or who shall pretend to tell destinies or fortunes; and all runaway servants or slaves, and all vagrants or vagabonds, common drunkards, common night walkers, and common prostitutes, shall be deemed and adjudged to be disorderly persons."

Section 2 dealt with a related group of problems:

"And Whereas divers ill disposed persons are frequently apprehended, having upon them implements for house breaking, or offensive weapons, or are found in or upon houses, ware houses, stables, barns or out houses, areas of houses, coach houses, smoke houses, inclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; *Be it further enacted,* That if any person shall be apprehended, having upon him or her any picklock key, crow, jack, bit, or other implement, with an intent to break and enter into any dwelling house, ware house, stable, barn, coach house, smoke house or out house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling house, ware house, stable, barn, coach house, smoke house or out house, or in any inclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person."

Section 3 provided that disorderly persons might be apprehended without a warrant and on conviction before a justice of the peace might be committed "to the work house of the city, town or county, there to be kept at hard labor for any time not exceeding three calendar months." Section 4 made it the duty of every justice of the peace "on information, or his own view" to issue his warrant to apprehend any dis-

orderly person. Section 5 empowered any two justices of the peace

"to bind out the child of any beggar, vagrant, vagabond, common drunkard, or common prostitute, or of any other person, who shall not provide for such child, as a servant or apprentice to any person, who may be willing to take such child, till the age of twenty one years, if a male, or eighteen years, if a female, or for a less time."

This short act stood unchanged and unsupplemented until 1864 through the last 45 years of the *Constitution of 1776* and the first 20 years of the *Constitution of 1844*. It is important to note that, notwithstanding the provision of *Article* XXII of the *Constitution of 1776* declaring "that the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal, forever," the act makes no provision at all for trial by jury, but it was never successfully challenged therefor. The 1776 Constitution had no provisions relating to presentment or indictment, so that phase of our problem was not present until 1844. Without anticipating at this point the constitutional problems under the *Constitution of 1844*, we must also note that the act of 1799 and the numerous acts which amended, supplemented and revised it after 1864 all also were never successfully challenged in spite of *Article* I, *paragraphs 7, 8 and 9 of the Constitution of 1844*, the pertinent parts of which read as follows:

"7. The right of trial by jury shall remain inviolate * * *.
"8. In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury * * *.
"9. No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except * * * in cases cognizable by justices of the peace * * *."

In passing it is to be observed that these three provisions of the 1844 Constitution are carried forward in the 1947 Constitution, quoted *supra*, the first two in identical words and the third in substance and meaning. In the third provision, for the words "cases cognizable by justices of the

peace" there is substituted in the new Constitution "in cases now prosecuted without indictment," the change in language being necessitated by the deletion from the earlier Constitution of any references to justices of the peace; see *Art.* VI, *Sec.* 7, *par.* 1, and *Art.* VII, *Sec.* 2, *par.* 7, of the *Constitution of* 1844.

The first change in *L.* 1799, *c.* 3, was effected by a supplement, *L.* 1864, *c.* 132, directed at runaway husbands or fathers who neglected to provide for their families. From that date follows a long succession of acts relating to disorderly conduct, covering the 103-year period of the *Constitution of* 1844 and the first five years under the *Constitution of* 1947, most of which are still reflected in the 96 sections of our present Disorderly Persons Act, *N. J. S.* 2A:170–1 *et seq.*

None of the provisions of the present Disorderly Persons Act provides for indictment or for trial by jury, though a few of the earlier acts, commencing with *L.* 1864, *c.* 132, did provide for a trial by jury. Yet we know of no instance in which it has been successfully contended that a provision of any of the Disorderly Persons Act was unconstitutional for failure to accord the defendant the right to an indictment or trial by jury. On the contrary, in *Griffin v. Mills,* 39 *N. J. L.* 587, 590 (*Sup. Ct.* 1877), Mr. Justice Van Syckel speaking for the court stated:

"That the justice may try cases under the act concerning disorderly persons, without a jury, where no right of jury trial is expressly given by the act, is too well settled in the practice of this state to be disturbed, and no reason appears why the defendant may not waive the right to a jury trial where the act confers it."

Moreover, many of the offenses which have long been considered disorderly conduct and which have been continued in the present act involve more serious conduct than does simple assault or simple assault and battery. In the field of trespass we find such offenses as malicious injury to property, malicious mischief, and the unlawful taking of a motor vehicle. In the category of frauds and misrepresentations are many reprehensible acts of fraud and deceit.

Certainly it cannot be seriously contended that such offenses or the use of narcotic drugs are as petty as simple assault and simple assault and battery. Yet it has never been successfully argued that the defendant accused of a violation of any one of these sections of the Disorderly Persons Act was entitled to indictment or trial by jury. And this is true regardless of the fact that many of the offenses contained in the Disorderly Persons Act were either indictable crimes at common law or at least are akin to such indictable crimes. Thus we find trespass with horses and hounds, cutting, destroying or removing trees or timber on the lands of another, malicious injury to property, and malicious mischief listed as disorderly conduct, *N. J. S.* 2A:170–34 to 37. All of these were indictable crimes at common law, 4 *Blackstone's Commentaries* 243–247. Article 4 of the Disorderly Persons Act, *N. J. S.* 2A:170–42 to 50, sets forth various kinds of fraud, which were indictable crimes at common law although at times they could also be prosecuted summarily, 4 *Blackstone's Commentaries* 158. Then there are such offenses as carrying weapons or burglar tools with an intent to break and enter, as well as being present in or near buildings or other places with an intent to steal, *N. J. S.* 2A:170–3. These are offenses arising out of the common-law indictable crimes of burglary and larceny. Then there is the offense of being a common thief or burglar, *N. J. S.* 2A:170–2, as in the case of *Griffin v. Mills*, 39 *N. J. L.* 587, *supra*, involving three common thieves. Clearly, theft and burglary were indictable crimes at common law. These are mere illustrations of the close relationship between disorderly conduct and crimes. This relationship has existed throughout the life of the Disorderly Persons Act, yet our courts have never held that the defendant charged with such disorderly conduct was entitled to indictment or trial by jury.

As we review the growth of the Disorderly Persons Act under our three successive Constitutions, it is manifest beyond a shadow of a doubt that the three clauses of the *Constitution of* 1844 and the corresponding three clauses of the *Constitution of* 1947 heretofore quoted exclude from their

operation not merely the limited subject matter of *L.* 1799, *c.* 3, *Paterson's Laws* 410, *supra,* but all of the related petty offenses that are now incorporated in the Disorderly Persons Act of today, *N. J. S.* 2A :170–1 *et seq., supra,* and which in one form or another have stood on the statute books without challenge a hundred years. It is unthinkable that if there were anything unconstitutional with respect to any phase of the growing jurisdiction over disorderly persons or the method of trial or the mode of punishment, that it would not have been subjected to judicial test in some one of the hundreds of thousands of cases that have been tried under one section or another of the act. The plain truth is that the bench and the bar and the public alike have recognized from the very beginning of this State, as the common law did before New Jersey became a state, the necessity not only for a summary jurisdiction over petty offenses, but also that the list of offenses must inevitably expand in response to the changing needs of the time and that some of these offenses of disorderly conduct, as we have seen, are even more related to common-law crimes than simple assault and battery. Nor are the advantages all with society; the defendant is spared the brand of being adjudged a criminal with all of its political, business and social implications, the punishment meted out to him is less severe than that imposed on corresponding crimes, and he is given the right to a speedy trial *de novo* in the County Court, *N. J. S.* 2A :3–6, *Rule* 2 :11.

### III. The Scope of Our Constitutional Provisions Relating to Indictment and Trial by Jury

We do not have to rely, however, solely on uniform acquiescence, even though such acquiescence has continued for more than a century, to demonstrate that charges of disorderly conduct are not subject in New Jersey to indictment and trial by jury. The legislation and the decisions, though the decisions are few in number, in two related fields of the summary jurisdiction of the justice of the peace and of his successor, the municipal magistrate, confirm our conclusions.

A. *Summary Jurisdiction Under the Vice and Immorality Act.* This jurisdiction found its beginning in "An Act for Suppressing of Immorality" passed in 1704, *Allinson's Acts* 3, which gave the justice of the peace summary power over any person guilty of drunkenness, cursing, swearing, or "Breaking the Lord's Day," and over any "public house-keeper" who shall suffer any tippling or drinking in his house on the Lord's day, punishable by a fine of six shillings and costs. There is no mention in the act of trial by jury. It was not until 1798, however, that New Jersey enacted its version of the Blue Laws which had been prevalent from a much earlier date in most of the American colonies, 2 *Encyclopedia of the Social Sciences* 600 (1930), in "An Act for suppressing vice and immorality," *Paterson's Laws* 329. It prohibited in much detail a wide variety of offenses such as work, diversions, selling of goods and travelling on the Sabbath; swearing; cursing; drunkenness; exhibiting plays and shows, unless licensed by three justices, and the like. The jurisdiction given to the justice of the peace was exercised in summary fashion without indictment or trial by jury and the punishment authorized was a specified fine, or in default of payment thereof the defendant was publicly placed in the stocks or in some instances committed to jail. The act was frequently supplemented as new developments in the mode of living required, *e. g., L.* 1854, *c.* 160, *p.* 398, prohibited the transportation of freight, except milk, on Sunday and authorized the justice of the peace to stop and detain any canal boat or railroad car transporting freight on Sunday in violation of the act; *L.* 1873, *c.* 563, *p.* 138, authorized each railroad company to run one passenger train each way over its roads on Sunday "for the accommodation of the citizens of this State"; and *L.* 1927, *c.* 116, *p.* 218, prohibited the operation of barbershops on Sunday. Many of the provisions of the Vice and Immorality Act had long fallen into disuse and it was not reenacted in the revision of *Title* 2, *L.* 1951, *c.* 344, although certain provisions thereof were carried forward, *N. J. S.* 2A:171–1 to 12, *supra.*

As in the case of the act of 1704, *Allinson's Acts* 3, *supra*, and as in the case of the various acts relating to disorderly persons, there was no provision for trial by jury. A claim to such a right was raised in one case, *Johnson v. Barclay,* 16 *N. J. L.* 1 (*Sup. Ct.* 1837), which was brought to reverse a conviction for profane swearing under the act for suppressing vice and immorality. To the objection that the justice of the peace refused the defendant a trial by jury Chief Justice Hornblower replied succinctly:

"In doing so, the justice was right. Convictions before a justice, were in practice in this state, long before the Constitution was formed—by the twenty-second article of that instrument, the trial by jury was to 'remain confirmed' as a part of the law of this (then) colony; but it was not introduced as a *new* mode of trial, in all cases—it was adopted, or rather continued, as it was then used in England and in this colony, and was not at that time, either there or here, resorted to in cases of summary proceedings and convictions for petty offences." *p.* 6.

It was not until 1839 that the Legislature provided for the first time that a defendant might demand a trial by a jury of six for any offense under the Vice and Immorality Act, except where the justice of the peace tried the case "upon his own view or personal knowledge," *L.* 1839–40, *pamph.* 4. This provision was carried forward into *R. S.* 2:211-9, but not into the present revision of *N. J. S. 2A.* Except for the vain argument made in *Johnson v. Barclay, supra,* it has never been urged that there is any right of indictment or trial by jury in summary proceedings before a justice of the peace under either the Vice and Immorality Act or the Disorderly Persons Act in the absence of statutory authorization therefor.

*B. Summary Jurisdiction Under Ordinances.* If the varieties of disorderly conduct and of violations of the Vice and Immorality Act seem large, the number of offenses created by municipal ordinances passed pursuant to power granted to municipalities by statutes is beyond cataloguing, for no attempt has ever been made to collate them on a statewide basis and, indeed, it is often difficult to locate all that have

been passed in any given municipality. Violations of ordinances relating to petty offenses cognizable before a justice of the peace or a municipal magistrate differ from disorderly conduct and offenses against the Vice and Immorality Act only in the source of their authorization. All are tried summarily before the same local judge without indictment or trial by jury, and all result, in the event of conviction, in the same kind of limited punishment without branding the defendant as a criminal. The same principles of constitutional law with reference to indictment and trial by jury are applicable to all three classes of cases.

There are three decisions relating to petty offenses under municipal ordinances that have a direct bearing on our problem. In *State v. Zeigler*, 32 *N. J. L.* 262, 266 (*Sup. Ct.* 1867), a case involving a violation of an ordinance regulating oyster cellars and beer shops, Mr. Justice Elmer by way of dictum expressed doubt as to the power of a justice of the peace to impose a penalty exceeding $16, that being the largest sum that could be tried by a justice without a jury before the *Constitution of* 1776:

"Many of the charters of municipal corporations in this state authorize the enforcement of their by-laws and ordinances by proceedings of a nature more or less summary, so that the questions so well argued by the counsel in this case, have become of great general importance. The proper construction of those provisions of our constitution, which require that the right of trial by jury shall remain inviolate, and that no person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, deserves the most careful consideration. Speaking for myself, I entertain strong doubts whether a pecuniary penalty exceeding sixteen dollars—that being the largest sum which could be tried by a justice without a jury before the constitution of 1776— can now be enforced otherwise than by the verdict of a jury, if demanded by the defendant; but it is not necessary to decide this question now, and no opinion is intended to be expressed in regard to it. Since the decision in the case of *Johnson v. Barclay*, 1 *Harr.* 1, the legislature has authorized jury trials in cases arising under the vice and immorality and bastardy acts, and will probably find it expedient, if not constitutionally necessary, to allow the same privilege in the enforcement of the numerous ordinances, so minutely regulating every man's business, in our incorporated cities and boroughs."

If his views as above expressed had been accepted, the right of trial by jury in every suit at law involving more than $16 would perforce have been triable only with the aid of a jury, unless the defendant waived jury trial. The same line of argument would have restricted the jurisdiction of the justice of the peace to the precise kinds of controversies that were cognizable before him prior to the *Constitution of 1776*, and would have effectually precluded the expansion of the jurisdiction of the justice of the peace which has characterized disorderly conduct, offenses involving vice and immorality, and proceedings under municipal ordinances.

Fortunately, the narrow view of the constitutional provisions put forward by him did not prevail. Whatever doubts were raised by the dictum in the *Zeigler* case as to the authority of *Johnson v. Barclay, supra,* and so as to the scope of the constitutional provisions under review here, were put to rest by Mr. Justice Depue's opinion in *McGear v. Woodruff,* 33 *N. J. L.* 213, 215–217 (*Sup. Ct.* 1868). That case brought up by *certiorari* the conviction of McGear under a municipal ordinance providing for imprisonment not exceeding seven days or a fine not exceeding $20. The right of the defendant below to a trial by jury was denied and the authority of *Johnson v. Barclay, supra,* upheld in the following language:

"The next reason relied on is, that the mayor, before whom the action was brought, refused to issue a *venire* to summon a jury for the trial of the cause, although the defendant applied for a trial by jury; and proceeded to try the complaint without a jury. In this he was right. The tenth section of the act incorporating the city of Bridgeton, (Acts of 1864, p. 538) gives the mayor or any justice of the peace of the city as a magistrate, cognizance to try complaints for violations of the ordinances of the city. It was urged then that the tenth section of the charter, authorizing the common council to provide for the enforcement of its ordinances by imprisonment, not exceeding seven days, or by a fine not exceeding twenty dollars, without providing for trial by jury, is unconstitutional.

The language of the seventh section of article first of the constitution of 1844, that 'the right of a trial by jury shall remain inviolate,' is not substantially different from that of the twenty-second article of the constitution of 1776, 'that the inestimable

right of trial by jury, shall remain confirmed as part of the law of this colony, without repeal, forever.' By that section it was not intended to introduce trial by jury in cases where it did not exist before, but merely to preserve it inviolate in cases where it existed at the time of the adoption of the constitution. Prior to the adoption of the constitution of 1776, convictions before magistrates for petty criminal offences, and violations of police regulations were of frequent occurrence, and were recognized as part of the laws of England. Since the adoption of that constitution, and prior to the adoption of the constitution of 1844, that practice was pursued in this state without objection. It was not intended, by the seventh section of the first act of the constitution of 1844, to introduce trial by jury in these cases where by law and by long practice the right did not previously exist. In *State v. Zeigler, S. C., June Term*, 1867 [32 *N. J. L.* 262], Mr. Justice Elmer expressed a doubt whether a pecuniary penalty exceeding sixteen dollars, that being the largest sum which could be tried by a justice without a jury, before the constitution of 1776, can now be enforced, otherwise than by the verdict of a jury, if demanded by the defendant. In *Johnson v. Barclay*, 1 *Harr.* 1, this court held in a case where a conviction, under the act for the suppression of vice and immorality was had for penalties above the sum of Sixteen dollars, that the defendant was not entitled to a trial by jury. And that the twenty-second article of the constitution then in force, did not extend to proceedings before magistrates under that act. *Indeed, extensive and summary police powers are constantly exercised in all the states of the Union for the repression of breaches of the peace and petty offences, and these statutes are not supposed to conflict with the constitutional provisions securing to the citizen a trial by jury. Sedg. Stat. Constr.* 548; see also 1 *Bish. Cr. Prac., note* 7 *to* § 758, and cases there cited. This constitutional provision does not prevent the enforcement of the by-laws of a municipal corporation without a jury trial. *Williams v. Augusta*, 4 *Ga.* 509; *Floyd v. Eatontown*, 14 *Ga.* 354.

That the remedy under the charter of the city is by an action of debt, instead of a summary conviction, can make no difference. The action was adopted only as a convenient form for the enforcement of ordinances; nor does it alter the case that the legislation that called the ordinance into existence, was that of a municipal corporation, under powers conferred upon it by the legislature, and not by the legislature of the state. Ordinances adopted by a municipal corporation under delegated powers in its charter, become part of the police regulations of the state—local in their operation—but, nevertheless, authorized by the supreme authority in the state; and it is competent for the legislature to authorize the enforcement of them by a form of proceedings that would be lawful if the ordinances were legislative acts.

In principle, the case of *Johnson v. Barclay* covers this point. The authority of that case should control the decision of this court in the present case." (Emphasis supplied.)

*Howe v. Treasurer of City of Plainfield,* 37 *N. J. L.* 145 (*Sup. Ct.* 1874) is of importance not only for its approval of *McGear v. Woodruff, supra,* and its cogent statement of the sound grounds on which that decision rests, but also for its analysis of the relation between an offense against a municipal ordinance and a misdemeanor against the State, a distinction which becomes important in the consideration of the cases with which we shall next have to deal:

"The ordinances being strictly within the terms of the city charter, if we reverse the judgment below on the ground stated, we must necessarily hold that the charter, in the particular under consideration, is void. This we are asked to do, because, as alleged, it is in violation of that provision of our state constitution, which ordains that the right of trial by jury shall remain inviolate. It was held in the case of *McGear v. Woodruff,* 4 *Vroom* 213 [33 *N. J. L.* 213], that the constitutional provision above referred to was substantially the same as that upon the same subject contained in the Constitution of 1776, and that neither was intended to extend the right of trial by jury to cases to which it did not previously attach. In that case, as well as in the case of *Byers v. Commonwealth,* 42 *Pa.* 89, it is clearly shown that prior to 1776, the legality of convictions before magistrates for petty offences and for violations of police regulations without trial by jury, was unquestioned. In the latter case, Justice Strong, delivering the opinion of the court, says: 'It is the old right, whatever it was, that we previously enjoyed that must remain inviolate alike in its mode of enjoyment and in its extent. What, then, was this right thus cherished and thus perpetuated? We inquire not now after the mode in which such trial was conducted. Our business at present is to ascertain how far the right to a trial by jury extended—to what controversies it was applicable. It was a right— the title to which was founded upon usage—and its measure is therefore to be sought in the usage which prevailed at the time when it was asserted. But never in England was there any usage, and, consequently, was there any right in the subject that every litigated question of fact should be submitted to a jury. In all that large class of cases which are cognizable in courts of equity, there never was any right of trial by jury, nor did the right extend to many other civil and criminal proceedings. Summary convictions for petty offences against statutes were always sustained, and they were never suffered to be in conflict with the common law right to a trial by jury. The ancient as well as the modern British statutes at large, are full of acts of Parliament authorizing such convictions, without referring to those which have been passed against non-attendance upon public worship of the established church, against refusal to take oaths of allegiance, against pro-

faneness and embezzlement, all of which provided for conviction and punishment of offenders without the intervention of a jury, it may suffice to notice the vagrant acts and the proceedings under them.'

The charter of Bridgeton, which was under consideration in the case of *McGear v. Woodruff*, authorized the common council to provide for the enforcement of its ordinances by imprisonment not exceeding seven days, or a fine not exceeding $20, and made the offense cognizable before a justice of the peace or mayor of the city; and the authority thus conferred, was held to be within the constitutional power of the legislature. I cannot distinguish that case, in principle, from the present, unless it may be upon the ground urged, that the case before us is one of conviction for an offence of selling intoxicating drinks by less measure than one quart without license, for that purpose first had and obtained, which is an offence indictable by general state law, and not, as in the case of *McGear v. Woodruff*, for violation of a city ordinance, by doing an act not indictable by the state law. I do not think that this feature of the case now under consideration, takes it without the principle adjudicated in the case of *McGear v. Woodruff*. I am aware that there is a want of harmony in the laws relating to the power of the legislature to delegate to a municipality the right to punish by law, as an offence against the laws of the municipality, an act which, by the law of the state, is a crime or misdemeanor. It is argued, with some force, that such punishment is in violation not only of the constitutional guaranty of trial by jury, but of those other provisions of the constitution which ordain that no person shall be held to answer for a criminal offence, unless on the presentment or indictment of a grand jury; and that, in all criminal prosecutions, the accused shall have the right to a speedy and public trial by an impartial jury. It could serve no useful purpose to refer to and comment on the many adjudged cases in which the question now presented to us is discussed. Judge Cooley, in his *Treatise on Constitutional Limitations, p.* 199, advances the doctrine that the same act may constitute an offence, both against the state and the municipal corporation, and that both may punish without violation of any constitutional principle; and I think he is abundantly supported, in principle as well as authority. If this be so, the arguments urged in behalf of the position taken by counsel of defendant, lose their force. I do not think the test, as Judge Dillon, in his work on *Municipal Corporations*, § 361, inclines to hold, is whether the act prohibited by ordinance is embraced in and made indictable by the criminal code of the state, but rather whether it may not be an act not only against the peace and dignity of the state, but also subversive of, or dangerous to the peace, good order, safety or health of the municipality. If the prohibited act may have this double aspect and prove injurious in its consequences to both jurisdictions, I do not see why it may not be prohibited and punished as well by municipal ordinance as by state law. The offence against the municipality is a different one from that against the state,

though both offences proceed from the same act. In the case of *Moore v. People of State of Illinois*, 14 *How*. 13 [14 *L. Ed*. 306], it was held that the same act may be an offence against a state and against the United States. In that case it appears that one Eels was indicted and convicted under the statute of Illinois, for unlawfully secreting a certain negro slave, owing service to a citizen of the state of Missouri. A writ of error was brought to the Supreme Court of the United States and the legality of the conviction questioned, on the ground that the statute of Illinois was void, because it subjected the offender to a double punishment for a single offence. The argument urged was, that inasmuch as the act for which the defendant stood indicted in the state court was one for which he was punishable by act of Congress, if proceedings under both statutes were allowed to stand, double punishment would be inflicted. The court denied both the fact assumed in the proposition and the inference sought to be drawn from it. Justice Grier, delivering the opinion of the court, says: 'But admitting that the plaintiff in error may be liable to an action under the act of Congress for the same act of harboring and preventing the owner from retaking his slave, it does not follow that he would be twice punished for the same offence. An offence, in its legal signification, means the transgression of a law. A man may be compelled to make reparation in damages to the injured party, and be liable also to punishment for a breach of the public peace in consequence of the same act; and may be said, in common parlance, to be twice punished for the same offence. Every citizen of the United States is also a citizen of a state or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offence or transgression of the laws of both.' These views of the learned judge, so clearly expressed, seem to me to embrace and settle the whole subject matter under consideration.

The defendant in the case before us, has been summarily prosecuted and convicted, not for a criminal offence against the state, but for an offence committed against the city, in violation of its internal police regulations. The same legal principles adjudicated in the case of *McGear v. Woodruff*, and *Byers v. Commonwealth*, above referred to, underlie and sustain the judgment under review. There are undoubtedly many criminal offences, the prohibition and punishment of which, cannot constitutionally be delegated by the legislature to a municipality as offences cognizable by it under the powers of police, but I do not think the retailing of intoxicating drinks, or the keeping of tippling houses, is included within that category. The defendant below was not entitled to a trial by jury." (at 147-151)

These two cases, which have never been questioned, establish the scope of the summary jurisdiction of local judges over petty offenses covered by ordinances, and all that is said in

these cases is equally applicable to disorderly persons and offenses under the vice and immorality act.

C. *The Doctrine of* State v. Anderson *and the Right to Indictment in Summary Proceedings.* *State v. Anderson,* 40 *N. J. L.* 224 (*Sup. Ct.* 1878), requires particular attention not only because of the unusual statutory scheme that the court had to deal with, but because of the reliance placed on the decision—improperly it seems to us on analysis—in subsequent cases, for the *Anderson* case cannot be understood alone but must be read in the light of *Meyer v. State,* 41 *N. J. L.* 6 (*Sup. Ct.* 1879), affirmed 42 *N. J. L.* 145 (*E. & A.* 1880), which followed closely on it.

The statute under review in this *Anderson* case, *Rev.* (1877) 493, provided that the clauses in the earlier statute:

"making it an indictable offense to sell ardent spirits without a license, shall not thereafter apply to offences committed in any of the incorporated cities of this state, the ordinances of which shall provide for the punishment of the unlicensed sale of spiritous liquors, and for the punishment of the same on Sunday. The second section of the same statute enacts, that where the ordinances of such cities provide for the punishment of the offense of keeping a disorderly house, it shall not thereafter be lawful to prosecute, by indictment, any person accused of keeping a disorderly house in such city, where the alleged offence consists only of the continuous or frequent violation of the provisions of the laws above mentioned inhibiting the sale of ardent spirits by unqualified persons." (at 224, 225)

There were two indictments before the court, one for the sale of ardent spirits without a license and the other for keeping a disorderly house wherein ardent spirits were habitually sold contrary to law. Chief Justice Beasley thus stated the issues for adjudication:

"As it is manifest that the two indictments in this case, the one being for the unlicensed sale of ardent spirits, and the other for repetitions of the same offence, contravene, with perfect directness, the prohibitions of this last cited statute, the only questions to be solved are—First. Whether such act is in force; and, Second. Whether it is constitutional."

On the first question he concluded that the act was in effect and he then proceeded to consider the constitutionality of the

act and of the indictments. As to the first indictment the court held:

"The offence of selling liquor without a license is a purely statutory offence. Independently of a prohibition by the legislature, such a sale is neither immoral nor illegal, and the law-maker, therefore, can put it under such control as may be thought best. Not being in its nature an indictable offence, it can be made punishable by a penalty, without indictment." (at 228)

On the other indictment, however, the Chief Justice ruled otherwise:

"The keeping of a disorderly house is a *crime* indictable at common law, and in this state it is punishable by fine and imprisonment in the state prison. Therefore, it is clear that if this offence can, for the purpose of *crimination*, trial and punishment, be put into the hands of these municipal authorities, it follows that all common law offences of the same grade can be, in like manner, so deposited. This, I think, cannot be conceded. Such an arrangement would, in a very plain way, infringe an important provision of the constitution of this state. Article I., section 9, of that instrument declares that 'No person shall be held to answer for a *criminal* offence, unless on the presentment or indictment of a grand jury, except in cases of impeachment, or in cases cognizable by justices of the peace,' etc. The purpose of this clause was to prevent the bringing of any citizen under the reproach of being arraigned for *crime* before the public, unless, by a previous examination taken in private, the grand inquest had certified that there existed some solid ground for making the charge. * * * The reputation of every man was thus put under the care of a single specified body. The language of the constitutional clause is very comprehensive, and the specified exceptions show conclusively that it was intended to cover the residue of the entire field of *criminal* accusation. In the presence of such a prohibition how then is it permissible to put a man on trial before a city court, charged with this common law offence, without the preliminary sanction of a grand jury? If it be said the punishment is only a fine, the answer is, the restraining clause in question has nothing to do with the result or effect of the trial, its object being to save from the *shame* of being brought before the bar of a *criminal* court, except in the authorized method after an antecedent inquisition. I am clearly of opinion that a trial of a person for this offence before the municipal court would be an act utterly void." (at 227) (Emphasis supplied)

In contradistinction to the *McGear* and *Howe* cases, *supra*, which involved no intermingling of statutes and ordinances,

the court was here confronted with a novel statutory attempt to delegate the extent of the punishment of a crime, which is an offense against the State, to each municipality that might see fit to legislate thereon. The offense remained a crime, but the punishment was to be regulated by ordinance—a unique kind of local option as to the extent to which the crime would be punished or tolerated. The defendant, having committed a crime against the State, would have a criminal record, even though his punishment was fixed by ordinance. Such a statutory device, if extended to all crimes, would have spelt the end of the enforcement of the criminal law of the State as a state system and would have resulted in the substitution therefor of the prevailing *mores* of each community. One can well understand Chief Justice Beasley's repugnance to such a novel and destructive method of criminal law enforcement. It is important to observe that throughout his opinion he dealt with the offenses before him as crimes, as they were in fact, and not as disorderly conduct or an offense under the Vice and Immorality Act or a violation of a municipal ordinance setting up a summary jurisdiction over some petty offense. Nowhere in his opinion did he treat petty offenses or the constitutional requirements relating to the trial thereof, but he dealt solely with the problem before him as a crime.

The *Anderson* case did not go to the Court of Errors and Appeals, but a similar case, *Meyer v. State*, 41 *N. J. L.* 6 (*Sup. Ct.* 1879), came before the Supreme Court the next year. There the defendant had been convicted of keeping a disorderly house wherein liquor was habitually sold on Sundays under the same legislative scheme as in the *Anderson* case. There was also an ordinance in Newark prohibiting, with a penalty, the sale of liquor on Sunday. After referring to his decision in the *Anderson* case, Chief Justice Beasley sustained the conviction of the defendant and the validity of the ordinance fixing the penalty for the crime for which the defendant had been indicted on a rationale entirely different from that set forth in the *Anderson* case:

"In the present instance this subject is presented in a new aspect. The contention at this time is, that the ordinance in the city of Newark forbidding the sale of liquor on Sunday, has superseded the provisions of the state law prohibitive of such sale. * * *

It is certainly indisputable that, by force of the law, wherever the municipal ordinance provides a punishment for the sale, on Sunday, of liquors of the kind specified, the punishment denounced against such act by the general law is not applicable. For the act of making a single forbidden sale on Sunday, the seller is amenable only under the law of the city; he is, for such an offence, dispunishable under the law of the state. * * * The contention is, that a series of such prohibited acts is nothing more, nor worse, than multiplied violations of a municipal ordinance, and that such violations, however numerous or continued, cannot become an indictable offence at common law.

. But this argument is founded on an assumption, the truth of which cannot be conceded. This traffic in sales of spirituous liquor on a Sunday is obviously something more than the disregard of a local ordinance. It is the general statutory law of the state that prohibits it everywhere, and it is this law that everywhere provides for its punishment. The legislature has not seen fit to leave it to the city of Newark to decide whether the practice in question shall be permitted or forbidden within its corporate bounds, but it has imperatively required that it shall be forbidden alike in this city as within the state at large. The statutory situation in this respect is this: in the state generally the act makes the offence punishable by indictment; in cities the same punishment follows the crime, unless in those cases in which an ordinance prescribes the punishment. Thus, by the general law, provision is made that this traffic shall be penal in the city of Newark; the people of that locality *cannot dispense with such penal consequence*, for all they can do is to declare how great such penalty shall be. By this adjustment the state prohibits the traffic, *the local ordinance fixes the extent of the punishment;* consequently, when the illegal traffic is practiced, *the state law is violated and the penalty of the ordinance is incurred.* When the rule of universal cessation of this traffic on Sundays is established by legislation, it is altogether a superficial view of the matter that regards an habitual violation of such policy in the light of a mere infringement of local police; for by such traffic the legislative policy of the state at large is infringed, and such series of acts becomes, upon general principles, an indictable offence." (at 7-8) (Emphasis supplied)

Here both the state statute and the municipal ordinance permitting local option as to punishment for a crime stand.

On appeal to the Court of Errors and Appeals, 42 *N. J. L.* 145, 157 (1880), Mr. Justice Van Syckel, speaking for a unanimous court, said:

"* * * This defence assumes that, in those cities where prohibitive ordinances exist, the sale of intoxicating liquors does not contravene the state law. Such a construction is plainly in conflict both with the letter and spirit of the general law.

It forbids the unlicensed sale everywhere; it denounces the penalty which shall fall upon the offender, except in those localities *where a substituted punishment shall be provided.* It is not left to the municipality to determine whether such selling is to be a punishable offence; the legislature has declared that it should be, the *quantum of punishment only being left to the city ordinance.*

The city of Newark could not make the unlicensed sale lawful, so as to dispense with penal consequences, because there is the state law reaching out its arm to strike every offender, unless the city shall otherwise punish him. Upon the repeal of such ordinance, the penalty of the state law would at once operate in the city; no legislation would be needed to revive it. The state law is mandatory, and, before any locality can escape its sanctions, it makes it a necessity that some other form of punishment shall be provided.

The Sunday traffic is therefore not merely an infringement of the statutory policy of the state, but it is the doing of an act which the state law says shall not be done without being punished. * * *"
(Emphasis supplied)

It is significant that nowhere in the opinion of the Court of Errors and Appeals is the decision in the *Anderson* case mentioned, though it was much relied on by the Attorney-General in his brief, 42 *N. J. L.* 153, 154. We are not here concerned with the interplay of common-law crimes, statutes and ordinances dealt with in the *Anderson* and *Meyer* cases. We are simply emphasizing that in the *Anderson* case Chief Justice Beasley was dealing with the defendant's conviction of a *crime,* as his entire opinion emphatically demonstrates, and not with a petty offense under the Disorderly Persons Act, the Vice and Immorality Act or a municipal ordinance. It would be unreasonable to assume that a jurist of his distinction had overlooked the then recent cases of *McGear v. Woodruff,* 33 *N. J. L.* 213, *supra,* and *Howe v. Treasurer of City of Plainfield,* 37 *N. J. L.* 145, *supra,* dealing with the constitutional aspects of summary jurisdiction over petty offenses, or the scope of the Disorderly Persons Act or the Vice and Immorality Act or the practice thereunder with reference to the trial of petty offenses. In any event, in the *Meyer* case he departed from his decision in the *Anderson*

case, and the Court of Errors and Appeals in the *Meyer* case passed over his decision in the *Anderson* case *sub silentio*, although it had only recently been decided and although, as we have seen, it was cited to the Court by the Attorney-General. Nevertheless, either through a misunderstanding of the *Meyer* case or due to the lustre of the Chief Justice's reputation, the broad language of the *Anderson* case has been frequently cited without any reference to the opinions in the *Meyer* case, as preventing an offense which was a common-law crime from being treated in a summary proceeding, despite the numerous examples of such proceedings under the Disorderly Persons Act, the Vice and Immorality Act, and municipal ordinances cited herein. It therefore becomes necessary for us to trace the doctrine of the *Anderson* case through later decisions.

Confining our attention chiefly to those decisions in which the *Anderson* case was cited by the court of last resort, we find several cases in which the reference is mere dictum. Thus *State v. Terry*, 72 *N. J. L.* 375 (*Sup. Ct.* 1905), affirmed 73 *N. J. L.* 554 (*E. & A.* 1906), involved a situation similar to that of the *Anderson* and *Meyer* cases, except that in the *Terry* case there was no applicable ordinance:

"Neither of the ordinances that were introduced in evidence deals at all with the offense of keeping a disorderly house, nor has the effect of providing a punishment for that offense when it consists in the continuous or frequent sales of intoxicating liquor without license." (at 379)

Likewise in *State v. Green*, 96 *N. J. L.* 434 (*Sup. Ct.* 1921), the defendant was charged with violating an ordinance which prohibited disorderly houses. The court held that "The revised charter of the borough of Princeton (*Pamph. L.* 1873, *p.* 567) gave to the borough council no express power to enact such an ordinance. Neither do we find any statute giving such power to the municipality." *P.* 435. Here, too, the citation of the *Anderson* case must be deemed dictum. Again in *Montclair v. Stanoyevich*, 6 *N. J.* 479 (1951), the defendant did not claim the right to indictment or trial by jury in the municipal court and in *Board of Health of*

*Weehawken Tp. v. New York Central R. R.*, 10 *N. J.* 294 (1952), the ordinance in question did not prohibit acts constituting a public nuisance at common law (*pp.* 305–306), so that the reference to the *Anderson* case and the decisions following it is dictum in each instance.

In *Richardson v. State Board of Control of Institutions & Agencies*, 98 *N. J. L.* 690 (*Sup. Ct.* 1923), 99 *N. J. L.* 516 (*E. & A.* 1924), the defendant was convicted under "An Act concerning the welfare of children," *L.* 1915, *c.* 246, *sec.* 2, *p.* 441, in a summary proceeding charging the defendant with assault and battery on a child. The court described the defendant's act as "a most brutal assault and battery." It would not come within the scope of the statute here under review, limited as it is to simple assaults and simple assaults and batteries, but under *N. J. S.* 2*A*:90–1 making atrocious assault and battery a high misdemeanor. *Katz v. Eldredge*, 97 *N. J. L.* 123 (*E. & A.* 1921), was a case dealing with the validity of the Prohibition Enforcement Act (*L.* 1921, *p.* 171), commonly known as the Van Ness Act. The opinions are not helpful to our present inquiry because there was not a majority of the court voting for any one of them. *Everingham v. City of Millville*, 3 *N. J. Misc.* 293 (*Sup. Ct.* 1925), is a *per curiam* decision of the former Supreme Court, affirmed *per curiam* on the opinion below, 101 *N. J. L.* 566 (*E. & A.* 1925). There the defendant was charged with violating an ordinance providing for summary abatement of a nuisance arising from the habitual and unlawful sale of intoxicating liquors. The power to abate a nuisance at common law never vested in a justice of the peace, for abatement was allowed only after indictment and conviction. *State v. Morris & Essex Railroad Co.*, 23 *N. J. L.* 360, at 370 (*Sup. Ct.* 1852), where Chief Justice Green said, "The principal object of an indictment for a nuisance is to compel it to be abated; and regularly a part of the judgment upon conviction is that the nuisance be abated"; but see *Mayor and Council of Borough of Alpine v. Brewster*, 7 *N. J.* 42 (1951). The act here under review does not, of course, involve abatement in any form.

Accordingly, on analysis the doctrine of the *Anderson* case, when read in the light of the decisions in the *Meyer* case, not only reveals the fact that it was not accepted by the Court of Errors and Appeals, but our examination of the cases in the court of last resort purporting to follow it demonstrates either that the references to it are dicta or that these cases dealt with facts that are different from the instant case. There is nothing in the *Anderson* case that throws the slightest doubt on the century of practice under the Disorderly Persons Act, or the act concerning vice and immorality, or under municipal ordinances providing for summary trial of petty offenses as approved in *Johnson v. Barclay*, 16 *N. J. L.* 1, *supra*, *McGear v. Woodruff*, 33 *N. J. L.* 213, *supra*, *Howe v. Treasurer of City of Plainfield*, 37 *N. J. L.* 145, *supra*, and *Griffin v. Mills*, 39 *N. J. L.* 587, *supra*. It is interesting to observe that in *State v. Gratz*, 86 *N. J. L.* 483 (*Sup. Ct.* 1914), the court reserved decision on the question of whether "if the ordinance had been directed to the offense of assault and battery, it would have been constitutional," saying that "the point has been considered in relation to other offenses (*Howe v. Plainfield*, 37 *N. J. L.* 145; *State v. Anderson*, 40 *N. J. L.* 224, *Meyer v. State*, 41 *N. J. L.* 6; 42 *N. J. L.* 145; *State v. Zeigler*, 46 *N. J. L.* 307; *State v. Terry*, 72 *N. J. L.* 375; 73 *N. J. L.* 554; *Atlantic City v. Rollins*, 76 *N. J. L.* 254); but, in the case at bar it is not before us, and we express no opinion on it."

D. *The Right to Trial by Jury.* We have seen that *Griffin v. Mills*, 39 *N. J. L.* 587, *supra*, is the leading case in our State dealing with the right to trial by jury under the Disorderly Persons Act and that it held that no such right exists unless expressly given by statute. This case is consonant with other decisions on the right to trial by jury, for our courts have held time and again that the right to trial by jury is not absolute and immutable. Thus in *Humphrey v. Eakeley*, 72 *N. J. L.* 424 (*Sup. Ct.* 1905):

"The language of that instrument with respect to this mode of trial is that it shall remain inviolate, not that it shall be unalterable;

so that the limits of legislative action are not so circumscribed as to preclude the exercise of some power over the jurisdiction and procedure of inferior courts * * *." (at 425)

"The essential meaning of 'inviolate' is freedom from hurt, harm, defilement, profanation or such other idea connoting partial destruction or substantial impairment, and that it in no sense imports immunity from all regulation." (at 426)

Likewise, a juvenile offender may be tried in a juvenile court, even though the offense is an indictable one at common law, *State v. Goldberg*, 124 *N. J. L.* 272 (*Sup. Ct.* 1940), affirmed *per curiam* 125 *N. J. L.* 501 (*E. & A.* 1940), wherein Mr. Justice Case stated for the court:

"The defendant is here demanding in his own behalf the procedure which the prosecutor of the pleas contends, somewhat anomalously, is a deprivation of the defendant's constitutional safeguards. Whatever may be said about the elimination of indictment and jury trial in crimes of heinous import, we think that such an argument is not pertinent to the offenses with which we are presently concerned. The carrying of concealed weapons is an offense only by statutory enactment. It may, therefore, even as to an adult, be made punishable by a penalty without indictment. *State v. Anderson*, 40 *N. J. L.* 224. The offense of assault with intent to kill is a misdemeanor under our statute and was a misdemeanor, not a felony, at common law. Even at common law it was not such an offense as, either in species or in character of the punishment, required the presence of the accused when the verdict was rendered." (at 276)

See also *State v. Smigelski*, 137 *N. J. L.* 149 (*Sup. Ct.* 1948), affirmed 1 *N. J.* 31 (1948).

Under the Motor Vehicle Act a driver may be convicted of drunken driving in a summary proceeding before the magistrate and receive a maximum sentence of six months. This section of the statute has been held valid when attacked as depriving a person of his constitutional right to indictment and trial by jury, *State v. Rodgers*, 91 *N. J. L.* 212 (*E. & A.* 1917).

While reference has been made for the sake of completeness to *Article* I, *paragraph* 8 of the *Constitution of* 1844, and *Article* I, *paragraph* 10 of the *Constitution of* 1947, "In all criminal prosecutions the accused shall have the right to a

speedy and public trial by an impartial jury," these sections cannot affect the statute here under review because a summary proceeding before a municipal magistrate is not a criminal prosecution.

## IV.

To recapitulate, justices of the peace had jurisdiction at common law before 1776 to punish simple assaults and simple assaults and batteries summarily without indictment and without trial by jury. In this State the summary jurisdiction of a justice of the peace or of a municipal magistrate in proceedings under the Disorderly Persons Act has never been seriously questioned under the *Constitutions of 1776, of 1844,* and *of 1947.* This jurisdiction has expanded in the exercise of police power of the State far beyond the narrow limits of the original act of 1799 to a great variety of related petty offenses, many of these offenses being far more serious in nature than simple assault or simple assault and battery and a considerable number of them being either indictable offenses at common law or akin thereto. In these respects the summary jurisdiction over disorderly persons resembles that of the justice of the peace and the magistrate under local ordinances governing petty offenses, where, as we have seen one and the same act may be both a violation of an ordinance and a crime. The only line of authority pointing in the opposite direction stems from *State v. Anderson,* 40 *N. J. L.* 224, *supra,* but the *Anderson* case was not followed in *State v. Meyer,* 41 *N. J. L.* 6, affirmed 42 *N. J. L.* 145, *supra,* nor does it mention *McGear v. Woodruff,* 33 *N. J. L.* 213, *supra,* and *Howe v. Treasurer of City of Plainfield,* 37 *N. J. L.* 145, *supra,* which define the power of the municipalities with respect to ordinances creating summary jurisdiction over petty offenses. This field is akin to the summary jurisdiction under the Disorderly Persons Act, and the same constitutional principles with reference to indictment and trial by jury control in both fields. We therefore conclude that *N. J. S. 2A* :170–26 is constitutional.

The judgment below is affirmed and the case is remanded

to the Municipal Court of Hoboken for further proceedings consistent with this opinion.

Heher, J. (dissenting). The question is not one of policy but of constitutional power. Considerations of policy have no place in an inquiry involving the constitutional province of the Legislature. If the act is within the legislative domain, the wisdom of the law. is not a justiciable issue; if it is not, then the policy of the measure is to be determined by the people through the exercise of the reserve power to amend the organic law.

The grand jury system and the right of trial by jury are secured by Article I, paragraphs 8, 9 and 10 of the *Constitution of* 1947. Paragraphs 9 and 10 guarantee the right of trial by jury in civil and criminal cases. Paragraph 8 forbids prosecution for a criminal offense, "unless on the presentment or ·indictment of a grand jury, except" in certain specific cases not here pertinent and "in cases *now* prosecuted without indictment."

There can be no doubt that, at the time of the adoption of the 1947 Constitution, assault and battery was an offense subject to prosecution only by indictment. This was then long settled law. There was no dissent from that conception of the offense. So much is conceded by my brothers of the majority.

In *State v. Anderson,* 40 *N. J. L.* 224 (*Sup. Ct.* 1878), Chief Justice Beasley held void a statute authorizing the prosecution under a local ordinance, as for the keeping of a disorderly house, of the frequent unlicensed sales of ardent spirits. Where an ordinance of an incorporated city of the State provided in such circumstances for the punishment of the offense of keeping a disorderly house, prosecution by indictment was forbidden. The Chief Justice said, with such compelling logic as to elicit unquestioning general acceptance, that the keeping of a disorderly house is a crime indictable at common law,

"and in this state it is punishable by fine and imprisonment in the state prison. Therefore, it is clear that if this offence can, for

the purpose of crimination, trial and punishment, be put into the hands of these municipal authorities, it follows that all common law offences of the same grade can be, in like manner, so deposited. This, I think cannot be conceded. Such an arrangement would, in a very plain way, infringe an important provision of the constitution of this state. Article I, section 9, of that instrument (*Constitution of* 1844) declares that 'No person shall be held to answer for a criminal offence, unless on the presentment or indictment or a grand jury, except in cases of impeachment, or in cases cognizable by justices of the peace,' &c. The purpose of this clause was to prevent the bringing of any citizen under the reproach of being arraigned for crime before the public, unless, by a previous examination taken in private, the grand inquest had certified that there existed some solid ground for making the charge. It took from the law officer of the state, the attorney-general, one of the established prerogatives of his office; that of filing his information against supposed offenders, and thus putting them on trial at his own volition. The reputation of every man was thus put under the care of a single specified body. The language of the constitutional clause is very comprehensive, and the specified exceptions show conclusively that it was intended to cover the residue of the entire field of criminal accusation. In the presence of such a prohibition, how then is it permissible to put a man on trial before a city court, charged with this common law offence, without the preliminary sanction of a grand jury? If it be said the punishment is only a fine, the answer is, the restraining clause in question has nothing to do with the result or effect of the trial, its object being to save from the shame of being brought before the bar of a criminal court, except in the authorized method after an antecedent inquisition. I am clearly of opinion that a trial of a person for this offence before the municipal court would be an act utterly void."

The *Anderson* case was not taken to the Court of Errors and Appeals, perhaps because of general concurrence in the validity of that exposition. But later on, in 1923, in a case involving the offense of assault and battery, the court of last resort unanimously affirmed a judgment by the Supreme Court voiding a statute permitting a summary prosecution under "An Act concerning the welfare of children," *L.* 1915, *p.* 441, of an offense amounting to an assault and battery upon a child under the care and custody of the defendant. Mr. Justice Kalisch for the Supreme Court said:

"The offences charged being indictable and triable by jury the prosecutrix could not be lawfully prosecuted for those acts under the statute, relating to the welfare of children. In *State v. Rodgers,*

91 *N. J. L.* 212, Justice Trenchard, speaking for the Court of Errors and Appeals (at *p.* 214) said: 'No doubt the legislature has power to provide for the punishment of an offence which is disorderly conduct merely and not an offence indictable at common law, by summary proceedings without indictment and trial by jury.' "

And the Court of Errors and Appeals declared:

"An assault and battery, no matter under what circumstances it may have been committed, is a crime indictable at common law, punishable by a fine or imprisonment or both. Whether a person who has committed a crime indictable at common law can be tried, convicted and punished in this state in a summary proceeding is not an open question. It was considered and decided in the case of *State v. Anderson,* 40 *N. J. L.* 224, 227, adversely to the contention of the present appellant, and the soundness of that decision has never been challenged in any subsequent judicial pronouncement." *Richardson v. State Board of Control of Institutions & Agencies,* 98 *N. J. L.* 690 (*Sup. Ct.* 1923), affirmed 99 *N. J. L.* 516 (*E. & A.* 1924).

Repeating verbatim the reasoning of Chief Justice Beasley, the court of last resort said: "The logic of this declaration is irresistible."

Such was the long established law, evoking no dissent whatever, when the *Constitution of* 1947 came into being. The nature of the offense of assault and battery, as respects these constitutional guaranties, was beyond controversy. We have quite recently held that it is fairly to be presumed that the incorporation in the 1947 Constitution of a principle embodied in the predecessor 1844 Constitution constituted acquiescence in the long-standing judicial interpretation of the prior provision. *McCutcheon v. State Building Authority,* 13 *N. J.* 46 (1953). This is one of the basic canons of constitutional construction. The provision of the old Constitution is deemed to be adopted as thus construed. The rule was applied by the Court of Errors and Appeals in *State v. De Lorenzo,* 81 *N. J. L.* 613, 623 (*E. & A.* 1911), Garrison, J.:

"From this doctrine it follows that the constitution of 1844, when it adopted the provision of the constitution of 1776, with respect to sheriffs, did so with knowledge of the construction that intervening legislation had placed upon such provision, and with the intent that such construction should continue and prevail."

The pertinent exception of Article I, paragraph 8 of the 1947 Constitution is confined to "cases now prosecuted without indictment." Assault and battery, by settled constitutional construction, could be prosecuted only by indictment; and unless this principle of the revised Constitution be assessed in keeping with the unquestioned construction of the same principle of the 1844 Constitution, the intent and purpose of the framers of the new Constitution will, I submit, be subverted and set at naught.

The right of trial by jury is immemorial. Introduced to this country by the colonists, it is the freeman's birthright. It was characterized by Blackstone as "the glory of the English law" and "the most transcendent privilege which any subject can enjoy." 3 *Blackstone's Commentaries* 379. Justice Story said that "the Constitution would have been justly obnoxious to the most conclusive objection if it had not recognized and confirmed it in the most solemn terms." 2 *Story, Consl. sec.* 1779. *Vide Dimick v. Schiedt*, 293 *U. S.* 474, 55 *S. Ct.* 296, 79 *L. Ed.* 603, 95 *A. L. R.* 1150 (1934); 31 *Am. Jur.* 552. There is controversy as to whether the right of trial by jury was established or secured by the provision of *Magna Carla* that no freeman shall be hurt, in either his person or property (*nisi per legale judicium parium suorum vel per legem terrae*), "unless by the lawful judgment of his peers, or by the law of the land." *Vide Thompson v. Utah*, 170 *U. S.* 343, 18 *S. Ct.* 620, 42 *L. Ed.* 1061 (1898), 39 *Harvard Law Review*, paper by Mr. Justice Frankfurter and Thomas G. Corcoran. But it cannot be denied that the modern jury system has been evolved from this principle of *Magna Carla* as the great bulwark of English liberties.

In the Declaration of Rights, adopted in 1774, the first Continental Congress unanimously resolved that "the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." *Capital Traction Co. v. Hof*, 174 *U. S.* 1, 19 *S. Ct.* 580, 582, 43 *L. Ed.* 873 (1899).

The common-law right of trial by jury has been secured by our several Constitutions; and to "effectuate any change in these rules is not to deal with the common law, *qua* common law, but to alter the Constitution. The distinction is fundamental, and has been clearly pointed out by Judge Cooley in 1 *Const. Limitations, 8th ed.*, 124." *Dimick v. Schiedt*, cited *supra* [293 *U. S.* 474, 55 *S. Ct.* 301].

Thus, the constitutional jury system has its genesis in the early common law; and the modifications effected by the use of summary proceedings for the prosecution of petty offenses came by statute in England—an innovation that at the outset was attended by arbitrary action subversive of the civil liberties guaranteed by the Great Charter, and repeal of the legislation.

Paley says that the

"earliest statute, upon which a summary conviction by a justice is on record, or of which a precedent is found in the books, is that of 33 *Hen.* 8, *c.* 6, against the practice of carrying daggs, or short-guns. Mr. Lambard has given a precedent of a conviction upon this statute; and there appears to have been one removed into the Court of Queen's Bench by *certiorari*, as early as the forty-third year of Elizabeth, 1600: and this very case affords a proof of the objection, which, in the state of manners at that day, might well exist against relaxing the jealousy of the common law, by entrusting anything like arbitrary authority in private hands. It appears that a sheriff's officer, going to execute a writ against a justice of the peace for a debt, and taking with him a hand-gun, from the apprehension of a rescue, the justice, instead of obeying the writ, apprehended, convicted, and imprisoned the officer, till he paid a fine of 10 £, under colour of the Act of Parliament." *Paley on Summary Convictions* (*8th ed.*), 10.

This writer declares it to be a settled maxim that

"a naked authority to *hear and determine* implied a proceeding conformable to the common law mode of determination only, *i. e.*, by a jury; and one instance only, that of 17 *Edw.* 4, *c.* 4, is noticed earlier than the reign of Henry 7, which carries the appearance of a more arbitrary and discretionary jurisdiction. But, in the eleventh year of that king's reign, the legislature was induced to break down all respect for the ancient common law mode of trial, by an Act that, in spite of the fair preamble, betrays its true

source in the rapacious policy of the monarch, viz., 11 *Hen.* 7, c. 3; which, pretending that many wholesome statutes were not executed, by reason of the embracery and corruption of the inquests, ordained, that it should be lawful for the justices of assize, and the justices of peace, in every county, upon information (for the king), *at their discretion*, to hear and determine all offences short of felony against any statute then in being. This discretionary authority, fettered by no rules, and intentionally absolved from the observance of law and usage, enabled the justices to execute all penal statutes without any presentment or trial by jury. The real intention of the statute, which was that of replenishing the Exchequer by the terror of arbitrary and vexatious prosecutions, under colour of penalties, upon all the most obsolete penal statutes, however obscure or inconsistent with the times, was rigorously seconded by Empson and Dudley, whose activity was stimulated by a grant of the extraordinary office of Clerks of the Forfeitures. By their means the mischiefs of a power, so liable in any hands to abuse, became an instrument of intolerable oppression, the more galling from its pretensions to legal authority. Among the first acts, therefore, of the Parliament which commenced with the succeeding reign, was the abolition of that dangerous power, by the repeal of the statute, and the attainder of the two obnoxious instruments of its abuse; whose atonement, according to the maxims of popular justice, was measured by the iniquity, rather than the illegality, of their acts." *Ibid., page 9.*

The author continues that after "this short and unfavorable experiment" adduced by Sir Edward Coke as an example of the danger of altering the common law, "and which has never been imitated by a like *general* law of the same nature, the legislature, for some time, seems to have been, not without reason, sparing in the sanction of a summary jurisdiction, even in particular offences." *Ibid., page 10.*

An assault is an attempt to commit a battery. It is a misdemeanor at common law. 1 *Hawkins, Pleas of the Crown,* 110; 3 *Blackstone's Commentaries,* 120; 4 *Ibid.* 216. An essential element is an intent to do bodily harm. *State v. Seifert,* 85 *N. J. L.* 104 (*Sup. Ct.* 1913); *Rex v. Gill,* 1 *Strange* 190; *Com. v. Eyre,* 1 *Serg. & R.* 347; *Tuberville v. Savage,* 1 *Mod.* 3; *Com. v. Adams,* 114 *Mass.* 323 (*Sup. Jud. Ct.* 1873). The common law does not classify assaults as to degree of guilt. All assaults are misdemeanors; yet some are deemed more serious than common assaults, in that apart from the general intent to commit an assault, there

was also a specific intent to accomplish another criminal purpose, as an assault with intent to murder, to rob or otherwise to perpetrate a felony; these latter were referred to an "aggravated assaults" and had greater punitive consequences than simple assaults. But there are no legal or technical differences at common law between assaults which are slight and assaults that are aggravated, and they are not recognized as distinct and separate crimes. *Burdick's Law of Crime, sec.* 345.

A battery, or, as it is usually called, an "assault and battery," is a consummated or completed assault. They are two separate and distinct offenses. *Hawkins, Pleas of the Court,* 110. To spit in a man's face is obviously a battery at common law. *Regina v. Cotesworth,* 6 *Mod.* 172. And to cut with a penknife a man's coat has been adjudged a battery. *Regina v. Day,* 1 *Cox C. C.* 207. But a battery ranges from the slightest to the greatest bodily hurts and may consist of countless physical injuries. *Burdick's Law of Crime, sections* 351, 352, 354. An assault and battery may be committed in the operation of an automobile on a public highway. *State v. Schutte,* 87 *N. J. L.* 15 (*Sup. Ct.* 1915), affirmed 88 *N. J. L.* 396 (*E. & A.* 1916).

Assault and battery is an indictable offense at common law. *Mountain v. Commonwealth,* 68 *Pa. Super.* 100 (1917); *In re Robinson,* 9 *Mackey* 570 (1892). In its very nature it is a crime as distinguished from the petty offense punishable summarily. Compare *District of Columbia v. Colts,* 282 *U. S.* 63, 51 *S. Ct.* 52, 75 *L. Ed.* 177 (1930); *District of Columbia v. Clawans,* 300 *U. S.* 617, 57 *S. Ct.* 660, 81 *L. Ed.* 843 (1936).

The statute (*N. J. S.* 2A:170–26) is, I submit, an infringement of the cited constitutional guaranties; and, accordingly, I would reverse the judgment and direct the dismissal of the complaint.

OLIPHANT and BURLING, JJ., join in this opinion.

*For affirmance*—Chief Justice VANDERBILT, and Justices WACHENFELD, JACOBS and BRENNAN—4.

*For reversal*—Justices HEHER, OLIPHANT and BURLING—3.