STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
LESTER L. GARDNER, DEFENDANT-APPELLANT.

Argued October 23, 1967—Decided May 6, 1968.

*Mr. Rudolph J. Rossetti* argued the cause for plaintiff-respondent (*Mr. Albert J. Scarduzio,* Deputy Attorney General in Charge, Camden County Prosecutor's Office, attorney; *Mr. Rudolph J. Rossetti,* Deputy Attorney General, Acting Assistant Prosecutor, on the brief).

*Mr. Charles Lee Harp, Jr.,* argued the cause for defendant-appellant.

The opinion of the court was delivered by

HANEMAN, J. At about 9:45 in the evening of May 4, 1964 Richard Lukasiak was severely beaten in the parking lot of the Red Eagle Tavern, Cherry Hill. Lukasiak who was six feet two inches tall and weighed 195 pounds, was taken by ambulance to the Cherry Hill Hospital and transferred from there to the Episcopal Hospital in Philadelphia, Pa. for special treatment. He expired at 6:45 A.M., May 5, 1964 without having regained consciousness.

Lester L. Gardner and Alfred Hicks were subsequently indicted for his murder. Hicks pleaded *non vult* to the charge of second degree murder before the trial of Gardner, who had pleaded not guilty. Gardner was convicted of second degree murder and sentenced to a term of 25 to 30 years imprisonment. Gardner appeals from both the conviction and sentence. Subsequent to filing his notice of appeal Gardner moved in this court for a remand to permit a motion

for a new trial grounded on newly discovered evidence emanating from appellate counsel's personal investigation which allegedly demonstrated a likelihood of perjurious testimony by a State witness. This Court held determination of that motion pending argument on this appeal.

The testimony on the trial was as follows: The driver of the ambulance which transported Lukasiak to the hospital testified that upon arrival at the parking lot at the Red Eagle Tavern in response to a telephone message, he found the deceased lying on his back bleeding from both ears and with bruises on his face and left cheek and a cut on the back of his head. Dr. Weston, a pathologist, and Assistant Medical Examiner of Philadelphia, performed the autopsy after Lukasiak's death at Episcopal Hospital. He testified that decedent died as a result primarily of injuries on the right side of his head inflicted with a blunt instrument. The other head injuries, including a cut on the back of the skull which was caused by decedent's fall, as well as kicks to the lower part of the body, were superficial injuries. He could not determine to what secondary degree, the other injuries may have contributed to his demise. Dr. Hoft of Episcopal Hospital testified from hospital records that the cause of death was a brain injury from a blow to the head.

The State's case as to the perpetrators of the assault revolved around the testimony of two alleged eyewitnesses who testified to seeing the defendant Gardner, while in the company of Alfred Hicks, strike the decedent with a stick of wood. The main witness was Herbert A. Kittredge who testified that he was at the time of the incident a groom working at Garden State Race Track where the defendant also worked. He testified that he had seen defendant, whom he knew by the nickname of "Pop-eye", at the Red Eagle during the evening of May 4, 1964. Kittredge stated that: He had come to the Red Eagle Tavern with his wife at noon that day, had lunch and about six beers. He then went to the track to complete some chores, leaving his wife at the tavern. He returned to the tavern at about 5:45

P.M. for dinner and had seven or eight more beers. At about 9:00 P.M. the decedent challenged and beat him at a game of pool. The bartender became annoyed at the fact that he and Lukasiak gambled, called the decedent a sharpshooter, and ordered repayment to Kittredge, who, however, sided with decedent in the dispute. As a result of the controversy, the decedent left the Red Eagle in the company of Kittredge, to whom he had offered a ride home. Kittredge, with his wife lagging behind to say goodbye to other customers in the tavern, followed the decedent. Decedent made a right turn on leaving the tavern, going toward its parking lot. When the witness arrived outside, the decedent was 25 to 30 feet away. Two men were waiting at the rear of a car in the parking lot with sticks in their hands approximately two and one-half to three feet long. As the decedent approached them, the smaller of the two struck the decedent over the head knocking him to the ground. The two proceeded to kick the decedent in the head and shoulders. Kittredge rushed between the two assailants and for the first time saw Hicks' and Gardner's faces. Hicks swung a stick at him, hitting him on the wrist, and also hit his wife on her hand and face. Hicks, and then Gardner, ran away. He was able to tell who struck decedent only by the height difference of the two assailants, Gardner being the shorter. Kittredge then ran back to the tavern and told the bartender of the fray. The latter after viewing the prone decedent called the police and the ambulance. Kittredge waited for the Cherry Hill police. He gave a statement and deposition concerning the events on May 5, 1964. The witness stated that he had not seen any dispute between the decedent and the defendant in the tavern. His wife was not available at trial because of her intervening death.

The other principal witness was Arthur T. Jordan. He testified on direct that: On the evening of May 4 he was walking on Chapel Avenue from the race track, where he groomed horses, to catch a bus. As he came to the Homestretch Restaurant, a distance of 50-75 feet from the Red Ea-

gle parking lot, he saw two men with sticks beating a third man. He said he saw Gardner strike the decedent with a stick. On cross, the following was developed: Although he first stated he was alone, he later admitted to being with someone else when he viewed the incident. The 50-75 feet distance from which he viewed the incident could have been as much as 600 feet. (The distance was actually in excess of 400 feet.) He could not distinguish the faces of the two attackers at the time of the blow, but could identify the defendant because Gardner had his hat on. He only saw Gardner's face after the blows were struck.

On redirect, he testified that he saw the decedent leave the tavern and did not remember the decedent having thrown any blows. Recalled on Monday, May 9, he admitted to having been with Raymond Ryan at the Homestretch Restaurant. Ryan testified for the defense. He stated that when he and Jordan arrived at the Homestretch Restaurant, the police and ambulance were already at the Red Eagle Tavern.

Patrick Gismonde, the final witness for the State, was the bartender at the Red Eagle. His testimony was to the effect that: The bar was crowded around nine o'clock. Lukasiak had made trouble by gambling in a pool game, and using abusive and vulgar language. Gismonde pushed Kittredge, a regular patron, down on the bar when he became involved in the dispute over the pool game. Lukasiak, Kittredge and Kittredge's wife left when the decedent was warned that he would be asked to leave if he did not behave himself. Although he remembered that Gardner and Hicks had been there, he did not know whether the decedent or the defendant left the bar first. He stated that Lester Gardner had been at the bar four or five times a week over a period of five to six years and had always been very mannerly.

The defendant, who was 5' 6" tall, testified as follows: He was employed at the Garden State race track. On May 4, 1964 he arrived at the Red Eagle Tavern at about 6:30 or 7:00 P.M. with Joe Bass and Alfred Hicks. After Gardner had bought a few rounds of beer, Hicks took Bass home.

Gardner undertook to play pool with another patron of the tavern. The decedent came over to the pool table and said "no little black so and so is going to shoot any pool in here", and proceeded to berate defendant and his race. Gardner left the pool table peacefully and returned to the bar fearful that Lukasiak would start trouble. After having another beer, Gardner went outside to look for Hicks who had promised to return. He turned left at the sidewalk on Chapel Avenue, going toward Highland Avenue and Route 38 where he met Hicks. The two men then re-entered the Red Eagle. Gardner went to the lavatory and on coming back to the bar found Lukasiak arguing with Hicks. Thereafter the bartender had an argument with Lukasiak and Kittredge. Kittredge and Lukasiak left the bar shortly after the former was hit by the bartender. He and Hicks left 15 or 20 minutes later. When he and Hicks left, he made a right turn going toward the parking lot, where he saw Kittredge and Lukasiak standing. Lukasiak ran over and grabbed him just as he arrived at the walk in front of the tavern. They scuffed, ending up in the parking lot. Hicks ran over to the sidewalk, where construction was being done and picked up a "club" from the wood lying around. Lukasiak was "choking" defendant by the collar of his jacket. Hicks struck Lukasiak with the stick. The victim fell to the ground. Defendant did not strike any blows but did kick Lukasiak two or three times "out of fear". Hicks struck Kittredge and his wife who intervened. Gardner and Hicks then ran to Hicks' car, which was parked near a Dunkin' Donuts Restaurant on the other side of Route 38. Dunkin' Donuts Restaurant was located a good distance from the Red Eagle on the opposite side of the tavern from the parking lot. To get the car would have required a left turn upon leaving the Red Eagle. Gardner explained why he turned right rather than left upon leaving the Red Eagle by saying he did not know where Hicks had parked the car. Later in the evening, after learning that Hicks had been picked up by the police, Gardner voluntarily went to the Cherry Hill Police

Station. He gave the police a statement at 4:55 A.M., May 5, 1964. The statement differed from the testimony given at trial in that he stated in the former that he did not know whether Hicks hit Lukasiak with an object and that Lukasiak and Kittredge had left the bar only a matter of seconds before he and Hicks left. In a deposition given to the Cherry Hill police on May 5, 1964 he said that when Hicks returned, he told Gardner that he was parked at Dunkin' Donuts. At trial he denied having made this statement but did not deny having met Hicks to the left of the parking lot in the direction of the Dunkin' Donuts.

Hicks testified for defendant. He admitted that he struck the decedent with the stick while, and only because, Lukasiak was "choking" Gardner. He corroborated Gardner's testimony to the effect that Gardner kicked him after he fell, although he later said he "couldn't remember" the decedent falling. He admitted to being under the influence of alcohol at the time.

Defendant asserted two basic defenses, *i. e.*, (1) he denied that he struck Lukasiak, and (2) in any event the blow which resulted in Lukasiak's death was delivered in defendant's defense, and the slaying was therefore an excusable homicide.

Defendant argues that the trial court erred in that:

 I. The court improperly charged that defendant had the burden of proving self-defense.
 II. The court improperly charged on the presumption of second degree murder.
 III. The court improperly charged on the credibility of an accomplice.
 IV. The court improperly admitted hospital reports.

We shall consider defendant's alleged grounds for reversal in the foregoing order.

I

*Did the trial court err in its charge that defendant had the burden of proving self-defense?*

The trial court first charged:

"* * * I will charge you that the law of New Jersey in reference to the concept of self-defense is as follows: '* * * *the burden is upon him, the defendant, to prove to your satisfaction*, a situation and circumstances under which the right to self-defense might be lawfully exercised, the State is obliged to prove these various elements *but as to whether the defendant acted in self-defense is for the defendant to prove.* The defendant need not *do so* beyond a reasonable doubt, but before *the defense is completed,* those facts and circumstances must appear to bring the act done by the defendant or acts done by the defendant within the presecribed limit.' " (Emphasis supplied)

The court later continued:

"* * * Where the justification is here as self-defense, as I told you, *the burden is upon the defendant to prove* to the satisfaction of the members of the jury a situation and circumstances under which the right of self-defense might be lawfully exercised, but in canvassing *this burden upon the defendant,* you must always bear in mind that the accused is entitled to the benefit of reasonable doubt upon the whole of the case.

\* \* \* \* \* \* \* \*

If there be reasonable doubt in your mind as to whether or not *this defense is made out,* the defendant is entitled to the benefit of that doubt." (Emphasis supplied)

 This charge erroneously places the burden of proving self-defense upon a defendant. The "burden of proving" self-defense is not on a defendant. Once proof appears either in the State's case or defendant's case in support of an allegation of self-defense, the State has the burden of proving that the defense is untrue. And that the State must do beyond a reasonable doubt. In *State v. Abbott,* 36 *N. J.* 63 (1961) this Court said at *p.* 72:

"There has been some uncertainty in the language of our cases upon the burden of proof with respect to self-defense. The decisions are treated in *State v. Chiarello,* 69 *N. J. Super.* 479 (1961), where the Appellate Division correctly said that although the burden is upon a defendant to adduce evidence to support the defense, yet if such evidence appears either in the State's case or upon the defendant's case, the issue must be left to the jury with this in-

struction: that the burden is upon the State to prove beyond a reasonable doubt that the defense is untrue, and hence there must be an acquittal if there is a reasonable doubt as to whether defendant did act in self-defense within the definition of that defense."

See also *State v. Terry,* 41 *N. J.* 1 (1963).

 If it can be said that the charge here given could in part be referring to defendant's burden of presenting evidence rather than the burden of persuasion, the answer is that the problem of presenting evidence is not a fit subject for a charge. An instruction on that topic can serve only to confuse the jury into believing that it encompasses the burden of proof and thus serves to subvert the proper discharge of the jury's function. The determination of whether a defendant has presented proof of self-defense is for the court. The only function of such a determination is to alert the judge to charge on the subject of self-defense if affirmative proof thereof appears. In *State v. Chiarello,* 69 *N. J. Super.* 479 (*App. Div.* 1961), certification denied 36 *N. J.* 301 (1962), the court said:

"This is a proposition of law for administration by the judge, not the jury. *McCormick, Evidence, op. cit., supra* (§307, *pp.* 638, 639). 'The shifting of the burden of evidence is governed by rules of procedure which are designed solely for the guidance of the court; with respect to their observance, operation, or effect, the jury has no function to perform.' *State v. Strawther, supra,* [342 Mo. 618] 116 *S. W.* 2d 133, at *p.* 139. Only after the judge determines that the burden of adducing evidence on an issue has been satisfied by the party to whom it has been allocated by the law does it become appropriate for the court, in charging the jury, to inform it as to which party has the burden of proof, in the sense of burden of persuasion, as to any issue, and concerning the quantum or quality of proof required to be adduced by the party in order to justify a verdict in his favor. *McCormick, Evidence, op. cit., supra,* at *p.* 639; 9 *Wigmore, op. cit., supra,* § 2487, *pp.* 278–280. See also *In re Week's Estate,* 29 *N. J. Super.* 533, 537 (*App. Div.* 1954); *cf. Kirschbaum v. Metropolitan Life Insurance Co.,* 133 *N. J. L.* 5 (*E. & A.* 1945)."

Although the court did in substance charge as defendant requested on the general elements of self-defense, no request was made for a charge on the burden of proof of self-defense

nor was an objection taken to the above quoted portion of the charge which concerned the burden of proof thereof.

▇ The charge as given expressed an erroneous legal doctrine affecting the substantial rights of the defendant and was of a sufficiently grievous nature to have the clear capacity to bring about an unjust result. *State v. Corby*, 28 *N. J.* 106 (1958); *State v. Lowrey*, 49 *N. J.* 476 (1967). Accordingly, we hold that there exists in the above quoted portion of the charge, plain and prejudicial error. *R. R.* 1:5-1(a).

[6] The foregoing applies to the thesis that the death of Lukasiak was caused by Gardner in defense of himself. Under the facts here present there also arises a companion thesis that Hicks struck the fatal blow in defense of Gardner. If the death was caused in this manner it is excusable and not murder. The jury should be instructed that the State also has the burden of proving beyond a reasonable doubt, that if death was caused by Hicks, the killing was not in defense of Gardner, in order to convict Gardner of murder.

## II

*Did the court improperly charge on the presumption of second degree murder?*

The court charged as follows:

"The act of illegal killing being established, *the presumption is that the offense is murder in the second degree.* When the prosecution seeks to raise the criminal responsibility for an unlawful homicide from murder in the second degree to murder in the first degree, it must prove beyond a reasonable doubt that the homicide was willful, deliberate, and premeditated killing. *When the accused seeks to reduce the offense to manslaughter, he must establish it to the satisfaction of the jury* for the law presumes all homicides to be committed with malice aforethought and thus amounting to murder *until the contrary appears from the circumstances of alleviation, excuse, or justification and it is necessary for the accused to establish such circumstances to the satisfaction of the jury unless they arise out of the evidence produced against him.*" (Emphasis supplied)

In: *State v. Brown,* 46 *N. J.* 96 (1965), this Court said in part at *p.* 105:

"It has long been the law of this State, and the uniform practice to advise the jury, that when a defendant is charged with murder and the proof offered by the State shows an unlawful killing, the crime is presumed to be murder in the second degree."

Consistent with the paraphrase of *Brown, supra,* the first sentence of the present charge properly instructed the jury but the charge continued in such a way as to dissipate the thrust of the *Brown* opinion.

In New Jersey, contrary to the common law, murder is divided into two degrees. *N. J. S.* 2A:113-2 reads:

"Murder which is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which is committed in perpetrating or attempting to perpetrate arson, burglary, kidnapping, rape, robbery or sodomy, is murder in the first degree. Any other kind of murder is murder in the second degree. A jury finding a person guilty of murder shall designate by their verdict whether it be murder in the first degree or in the second degree."

As noted in *Brown, supra,* 46 *N. J.,* at *p.* 106, the sentence "Any other kind of *murder* is murder in the second degree" (Emphasis supplied) raises a presumption favorable to defendant that upon proof of *murder,* defendant is guilty of murder in the second degree and not of murder in the first degree. And it is the State's burden if it seeks to elevate the crime to first degree to prove additionally the three elements, *i. e.,* willfulness, premeditation and deliberation.

Before the presumption arises, however, the State must, as noted, prove a *murder.* Murder requires proof of a malicious killing which is unlawful, *i. e.,* a killing *without* justification or excuse. The mere proof of a homicide in New Jersey does not give rise to a presumption that it is murder in any degree although at common law any homicide

was presumed to be murder. As noted, to constitute murder, the killing must be unlawful and malicious.

The meaning of the word "malice" in connection with murder is "certainly not beyond controversy", Great Britain, *Royal Commission on Capital Punishment — Report* 1949-1953 (1953). This statement is a most conservative expression of the problem which has confronted the courts for years. Various courts have attempted in sundry ways to define "malice". The above referred report of the Royal Commission at *p. 27* states:

"* * * 'Malice aforethought' is simply a comprehensive name for a number of different mental attitudes which have been variously defined at different stages in the development of the law, the presence of any one of which in the accused has been held by the courts to render a homicide particularly heinous and therefore to make it murder. These states of mind have been variously expressed by various authorities, but the statement of the modern law most commonly cited as authoritative is that given in 1877 by Sir James Stephen in his *Digest of the Criminal Law*:

'Malice aforethought' means any one or more of the following states of mind preceding or co-existing with the act or omission by which death is caused, and it may exist where that act is unpremeditated.

(a) An intention to cause the death of, or grievous bodily harm to, any person, whether such person is the person actually killed or not;

(b) Knowledge that the act which causes death will probably cause the death of, or grievous bodily harm to, some person, whether such person is the person actually killed or not, although such knowledge is accompanied by indifference whether death or grievous bodily harm is caused or not, or by a wish that it may not be caused; * * *" "

Sir James Stephen listed as well two other categories of states of mind which come within the concept of "malice" in relation to murder. For present purposes, it is sufficient to say that "malice" encompasses at least the above two quoted Stephen classes. See also 1 *Wharton's Criminal Law and Procedure* 522 (1957); *State v. Silverio,* 79 *N. J. L.* 482, 488 (*E. & A.* 1910); *State v. Moynihan,* 93 *N. J. L.* 252, 258 (*E. & A.* 1919).

■■■■■ The other requirement of a murder, in addition to malice, is that it be unlawful, which as noted means that it be without justification or excuse. "Without justification" means that the killing may not have occurred at the command, or with the permission, of the law (as when a police officer kills in discharge of his duties). "Without excuse" means that the killing may not have occurred by accident or in self-preservation. *State v. Brown,* 22 *N. J.* 405, 410–411 (1956).

■■■■■ Only when the essential elements of murder have been proved beyond a reasonable doubt does the presumption of murder in the second degree arise. This presumption is intended to favor the defendant and to underscore the burden of the State to prove three additional elements, *i. e.,* premeditation, deliberation and willfulness as defined in *State v. DiPaolo,* 34 *N. J.* 279, 295 (1961), beyond a reasonable doubt, in order to elevate the crime from second degree to first degree. The presumption has no role whatever in determining whether (1) there was in fact an intent to kill or inflict grave bodily harm (the minimum requirement of murder), or (2) the homicide was justifiable or excusable, or (3) the homicide was no greater than manslaughter. The State's burden of proving, beyond a reasonable doubt, that the homicide was murder includes the burden of so proving that the killing was not accidental, justified or excusable, or manslaughter. The State must bear this burden throughout the entire trial and the presumption comes into play only after the State has satisfied this mandate. It must, of course, be remembered in connection with the foregoing discussion that we are not here dealing with a felony murder.

■■■■ In the matter *sub judice* the charge, being deficient in failing to convey to the jury proper instructions on the burden of the State, constituted plain error and even though defendant registered no exception thereto at the trial, the result constituted reversible error. *State v. Butler,* 27 *N. J.* 560 (1958).

## III

*Did the court err in charging on the credibility of an accomplice?*

The charge that the witness Hicks and defendant were "accomplices" was delivered on the court's own initiative without a request from either the State or defendant.

Ordinarily the problem of the credibility of an accomplice arises where he testifies for the State. His testimony is then subjected to close scrutiny. The reason therefor is stated in *State v. Spruill,* 16 *N. J.* 73 (1954) at *p.* 78 as follows:

"* * * Accomplices, tainted as they are with confessed criminality, are often influenced in their testimony by the strong motive of hope of favor or pardon; and so it is incumbent upon the courts to 'look carefully into the secret motives that might actuate bad minds to draw in and victimize the innocent.' *State v. Hogan,* 13 *N. J. Misc.* 117 (*Sup. Ct.* 1935), affirmed 115 *N. J. L.* 531 (*E. & A.* 1935). The fact that co-conspirators have turned 'State's evidence' naturally affects 'injuriously the credit to be given to their testimony'; for it is 'suggestive, at least, of a bargain between them and the State authorities with relation to the punishment which would be inflicted upon them in case their testimony aided in bringing about' the conviction of the accused. *State v. Black,* 97 *N. J. L.* 361 (*Sup. Ct.* 1922)."

In the matter *sub judice* the so-called accomplice, however, testified as a defendant's witness. The question of his credibility would arise as with any other witness. Under the facts here present, however, there exists no reason to specially charge the "accomplice" rule, as the witness could not hope for any special consideration from the State for having testified for defendant. The only possible justification for such a charge here is the surprise pleaded by the defense to some of Hicks' answers and the consequent cross-examination by defendant of his own witness. Such justification is based on too tenuous a rationalization to be accepted, as even then the charge would probably redound to defendant's disadvantage rather than advantage.

 As noted in *State v. Begyn,* 34 *N. J.* 35 (1961) where an accomplice testifies, the charge is ordinarily for the benefit of the defendant. But even with such an instruction the charge may be to defendant's disadvantage because the very use of "accomplice" has an opprobious and detrimental connotation. The use of that word where the witness admits his guilt gives rise to the natural suggestion that the defendant whom he has implicated is likewise a guilty participant in the crime. It is apparent that the use of the word accomplice should wherever possible be avoided. See *Begyn, supra.*

 In any event, in *State v. Mangrella,* 86 *N. J. Super.* 404 (*App. Div.* 1965) the court said:

> "The judge may give such a charge without a request and, as a matter of fact, that was the origin of the 'accomplice rule' (7 *Wigmore, Evidence,* § 2057, *p.* 322 (3*d ed.* 1940)). However, the judge need not give such a charge unless requested. *State v. Wigfall,* 70 *N. J. Super.* 506 (*App. Div.* 1961); *State v. Begyn, supra.* Indeed, it may be dangerous to volunteer such a charge for, as was pointed out in *Begyn, supra,* a defendant may claim to be prejudiced by it. Even when requested, the charge has to be carefully tailored to fit the facts of the particular case (*Begyn, supra*). Therefore, the defendant should be the one to ask for the charge and to do the tailoring. *Cf. State v. Evans,* 107 *N. J. L.* 474, 476 (*E. & A.* 1930)."

Because of the dangers to defendant's case, upon retrial, the charge should not be given except upon the request of counsel and then the trial judge should carefully phrase the charge in the light of the developments at the trial.

## IV

*Did the court err in admitting the decedent's hospital records?*

 The crucial question was whether defendant participated in an unjustified attack upon the deceased which resulted in his death. The objection to the hospital records is grounded on phrases which state that deceased was "struck

from behind by a '2x4'," "beaten up with a wooden club", "had apparently been beaten tonight with a wooden club". Other statements of similar import were contained in letters attached to the reports. These extra-court, hearsay statements have the clear capacity to prejudice defendant, suggesting as they do an unprovoked assault on deceased. Insofar as the reports concerned medical facts reported by physicians in the course of treatment and upon a showing of trustworthiness the reports were admissible as business records. *Petrosino v. Public Service Coordinated Transport,* 1 *N. J. Super* 19, 25 (*App. Div.* 1948). However, the above quoted and similar statements were not medical facts in that they contained an opinion of the cause of injuries which appears to have come from a source other than the physician's examinations. As such they should not have come to the attention of the jury.

We find the balance of defendant's grounds without merit. We suggest, however, by way of guidance upon a retrial, that the State make no reference in its opening to Hicks' *non vull* plea to the murder of Lukasiak. Whether reference thereto by the State in its closing and by the court in its charge would be proper, will depend, of course, on whether and how that fact may come to the attention of the jury.

In the light of our determination to reverse and remand, there is no necessity to consider the question of whether defendant's sentence was excessive. The motion to remand to permit a motion for a new trial is of course academic.

Reversed and remanded for a new trial.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, GOLDMANN, SCHETTINO and HANEMAN—7.

*For affirmance*—None.