**U. S. ex rel. James V. BRODIE, Petitioner,**

**v.**

**Gary J. HILTON, Superintendent, etc., Respondents.**

**Civ. No. 80–1508.**

United States District Court, D. New Jersey.

Aug. 4, 1980.

Stanley Van Ness, N. J. Public Defender by William E. Graves, Asst. Deputy Public Defender and Stanford M. Singer, East Orange, N. J. (designated counsel), for petitioner.

John J. Degnan, Atty. Gen. of New Jersey by Miriam K. Brody, Princeton, N. J. (Asst. Essex County Prosecutor) and Mark

---

**6.** *See* Paragraph N to Appendix A of 43 Fed. Reg. 2570 (Jan. 17, 1978).

H. Genser (Asst. Essex County Prosecutor), Newark, N. J., on brief, for respondents.

### OPINION

BIUNNO, District Judge.

On January 24, 1977, James V. Brodie was convicted after jury trial of felony murder and the mandatory sentence of life imprisonment was thereupon imposed.

His appeal to the Superior Court, Appellate Division having resulted in an affirmance of that conviction, and a petition for certification having been denied by the Supreme Court of New Jersey, he filed petition here on May 27, 1980 under 28 U.S.C. § 2254.

■ His challenge here is that the trial judge denied an express request to charge the jury (and thus allow it to return a verdict) in respect to second–degree murder and manslaughter, the proposition being that as there was only indirect and circumstantial evidence, but no direct evidence, that the victim was placed in fear, there was a factual basis upon which the jury could have found that robbery, the underlying felony for felony murder in this case, had not been proved, and the offense may have been found to be either unlawful entry, larceny, and either second–degree murder or manslaughter.

As articulated in the brief, the question presented is:

"Whether a State defendant charged with felony–murder is entitled to a trial by jury as to all degrees of criminal homicide, where an essential element of the underlying felony was not supported by any direct evidence."

All of the events, as well as the trial and conviction, occurred before the revision in 1979 of New Jersey's general criminal law as N.J.S.A. Title 2C, and so what follows is in the light of the law in effect at the time.

New Jersey is a common law state. The common law of England was expressly continued by Art. 22 of *N.J.Const.* 1776, by Art. X, sec. 1 of *N.J.Const.* 1844, and by Art. 11, sec. 1, par. 3 of *N.J.Const.* 1947.

Thus, the pattern of criminal law before Title 2C was enacted was essentially a pattern of common law crimes, added to which there was a larger pattern of statutory offenses, some being crimes and others not. Over the years, the labelling of common law and statutory crimes became blurred. The label "felony" largely disappeared from the statute books. Such common law felonies as arson, burglary, larceny, rape, robbery and sodomy, along with other serious statutory offenses as kidnapping, were relabelled as "high misdemeanors" carrying a general penalty of $2,000. fine or 7 years' imprisonment or both unless another punishment was specifically provided, N.J.S. 2A:85–6. Most other indictable offenses were labelled "misdemeanors", carrying a general penalty of $1,000. fine or 3 years' imprisonment, or both, unless a different punishment was specially provided, N.J.S. 2A:85–7. Lesser non–indictable offenses were categorized as "disorderly conduct" and were generally collected at N.J.S. 2A:107–1 et seq.

In the case of the common law offenses of murder and manslaughter, these common law labels were retained, and they were not classified as "high misdemeanors", "misdemeanors" or by any other than their common law names.

There was no statute at all that defined murder or manslaughter; these were and remained common law crimes. N.J.S. 2A:113–2, which designated *degrees* of murder, and N.J.S. 2A:113–4, which specified the *punishment* for each degree of murder, did not define murder. Nor did N.J.S. 2A:113–5 do more than specify the *punishment* for "the crime of manslaughter."

The focus here is on felony–murder, a statutory addition or supplement to common law murder. The provisions are found in N.J.S. 2A:113–1 which, so far as pertinent here, states that:

" * * * if the death of anyone ensues from the committing or attempting to commit [by any person] [the] crime [of] robbery * * * then such person so killing is guilty of murder."

This statutory provision for felony–murder is an old one. See, *State v. Cooper*, 13

N.J.L. 361 (Sup.1833). As Holmes observed, if the lawmaker may conceive that deaths happen disproportionately often in connection with the commission of other crimes, then the law may throw on the actor the peril of what evidence might indicate to be otherwise unforeseen or accidental deaths, the consequences which the legislator apprehends. *The Common Law,* pp. 58–59.

Thus, when the fact is that a death "ensues" from the commission of a designated offense, such as robbery, the statute serves to substitute that fact for a showing of "malice", an essential element of common law murder, see *State v. Gardner,* 51 N.J. 444, 242 A.2d 1 (1968), quoting, in part, Sir James Stephens' *Digest of the Common Law.*

The provisions of N.J.S. 2A:113–2 deal with degrees of murder, as noted above. It gathers together, as "murder in the first degree", not only murder perpetrated by poison, or by lying in wait, "or by *any other kind* of willful, deliberate and premeditated killing," but also murder (as specified by N.J.S. 2A:113–1) "committed in perpetrating .... robbery ...." Any *other* kind of murder is murder in the second degree.

At the times involved here, the N.J. Court Rules, R. 3:7–3(b) provided that: "It is sufficient in every indictment for murder to charge that the defendant did willfully, feloniously and of his malice aforethought kill and murder the deceased, and in every indictment for manslaughter, to charge that the defendant did feloniously kill and slay the deceased." [NOTE that the current text of this rule has been amended to refer to revised Title 2C].

Thus, this ancient, standard and short–form indictment has long been accepted as sufficient to apprise the defendant that he has been charged with "murder", without specifying in itself anything about degrees of murder, or about the method of the murder, or whether the murder charged is as at common law or according to a statute. Those clarifications are left to procedural tools such as bills of particulars or other modes of discovery, to the evidence at trial, and to the instructions to the jury on the applicable law as shaped by the evidence at trial.

As the argument is advanced, it takes the theme that Brodie was deprived of his right of trial by jury under the Sixth Amendment, applied to New Jersey through the Fourteenth Amendment, by depriving him of the opportunity to have the jury decide, on the evidence, that he was not guilty of first degree murder (felony–murder) but of only second degree murder or manslaughter. This, in turn, is grounded on the proposition that there was indirect or circumstantial evidence, and no direct evidence, that the deceased victim had been put in fear, claimed to be an essential element of common law robbery. It is argued that without instructions on second–degree murder or manslaughter, the charge as a whole compelled the jury to presume conclusively the felony (robbery) which is a predicate for felony–murder.

In a sense, the argument tends to the theme that second-degree murder and manslaughter were lesser included offenses to Count 1, and that the law on them should have been included in the instructions, citing such federal cases as *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *U.S. ex rel. Johnson v. Hatrack,* 417 F.Supp. 316 (D.N.J., 1976), aff'd list 564 F.2d 90 (CA 3, 1977), *cert. den.; U.S. ex rel. O'Connor v. N.J.,* 405 F.2d 632 (CA 3, 1969), *cert. den.,* and New Jersey cases such as *State v. Butler,* 27 N.J. 560, 143 A.2d 530 (1958); *State v. DiPaolo,* 34 N.J. 279, 168 A.2d 401 (1961), *cert. den.; State v. Frankland,* 51 N.J. 221, 238 A.2d 680 (1968); *State v. Inman,* 140 N.J.Super. 510, 357 A.2d 6 (App.1976).

The difficulty with the argument, and with the precedents relied on, has two aspects. The first is that the court's charge on robbery was impeccable, and no exception was taken to it then or now. It correctly pointed out that the element under discussion could be shown either by showing the use of violence or by putting the victim

in fear. And the court suggested to the jury that it consider *first* whether defendant had been proved guilty of robbery (failing which it would be obliged to acquit on both counts) and only if it found him so guilty, to consider the felony–murder charge. In other words, the instructions directed the jury to consider and decide the predicate first, and then the consequences only if the predicate were established.

The other aspect is that Brodie testified that he was not present, was not at the scene, of the alleged robbery and felony–murder. He said he had been together with two others, who testified against him, and then went elsewhere and did not accompany them or participate. The verdict indicates that the jury did not give his testimony credence, but taking the testimony as it was, there simply was no evidence in the case capable of supporting a verdict against him for second–degree murder or for manslaughter. See, *Beck v. Alabama,* —— U.S. ——, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

In sum, Brodie's posture during trial, including the summation, was that he was not present at the alleged robbery from which death was claimed to have ensued. His argument here amounts to saying: "And, if I *was* there, it was not robbery that I committed, but only unlawful entry or larceny, coupled with a death that was only second degree murder or manslaughter," and the court should have charged the jury on the elements of these offenses.

The argument will not do. This is not a case like *Beck, supra,* where local (Alabama) law denounced felony–murder in the usual fashion, for which the penalty was life imprisonment, and separately denounced fourteen offenses for which the penalty was death. Some of these, like the one involved, matched a corresponding felony–murder offense except that instead of merely requiring it to be shown that a death ensued from the commission of the related crime, it required a further showing that the victim was "intentionally killed."

In *Beck,* there was a charge of robbery with a related death. Proof of the robbery and the ensuing death was enough to sup-

port a verdict of guilty of felony–murder, with life imprisonment. The capital offense statute, Ala.Code § 13–11–12(a)(2) made it an offense punishable by death when:

> "Robbery [is committed and] when the victim is *intentionally killed* by the defendant."

Thus the difference in essential elements between the capital offense and felony–murder was that if intention to kill were shown, the death penalty could be imposed; if not shown, the offense was felony–murder. Under these circumstances, felony–murder in a given case could well be a lesser included offense. In fact, Beck's own testimony conceded his presence and his participation in the robbery of the victim, but denied having killed or any intention to kill. Beck said he seized the victim, intending to tie him with a rope, when his accomplice or confederate unexpectedly struck and killed the victim.

The Alabama statute did not allow the felony–murder doctrine to serve as evidence of the intent to kill required for the capital offense. As construed by Alabama's highest court, the burden to prove the statutory element of "intentional killing" could only be met by evidence to show a "particularized intent" to kill the victim, see discussion in *Beck* at footnote 2. No quarrel or disagreement is seen for this aspect of Alabama law.

However, the first part of the capital offense statute, as consistently construed, *prohibited* the giving of an instruction for lesser included offenses when the crime charged was a capital offense. See *Beck* at footnote 3.

It was clearly this aspect of Alabama law that led to the conclusion that due process was denied. It is plain from the statement of the question on which certiorari was granted, that the issue turned on the existence of evidence which would have supported a verdict of guilt of a lesser included non–capital offense. The entire discussion of the subject of lesser included offenses and corresponding instructions to the jury

is in the context of individual case–by–case evaluation, depending on the existence of evidence in the particular case to support the lesser included offense verdict.

Nowhere in the opinion is there the remotest suggestion that a trial judge is obliged to instruct the jury on the law that applies to every conceivable common–law and statutory offense that might possibly be a lesser included offense as a matter of legal theory. Rather, the discussion of both federal and state law is in terms of cases where "the *evidence* would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater," (emphasis added) at ——, 100 S.Ct. at 2388, 65 L.Ed.2d at 401, text supported by footnote 11 (for the federal rule), and "where the *evidence* warrants it," at ——, 100 S.Ct. at 2388, 65 L.Ed.2d at 402, text supported by footnote 12, (emphasis added).

More significantly, the court recorded the fact that it has never been held by it "that a defendant is entitled to a lesser included offense instruction as a matter of due process", at ——, 100 S.Ct. at 2389, 65 L.Ed.2d at 402, repeating what was said in *Keeble v. U.S.*, 412 U.S. 205, at 213, 93 S.Ct. 1993, at 1998, 36 L.Ed.2d 844 (1973), quoted 48 L.W. at 4803, in discussing the Major Crimes Act, 18 U.S.C. §§ 1153 and 3242 (dealing with particular crimes charged to have been committed by Indians in Indian country or on Indian reservations, and making them triable in a federal court rather than by tribal custom).

With this background on the legal aspects, a brief review of the fact pattern of the evidence will be useful. The testimony indicated that on the day of the incident Brodie, together with a friend, Emory Craig, and Paula Kirby, engaged in a discussion about how to get money from the victim, one Gertrude Casey, a woman in her 70's with failing eyesight and hearing. Kirby knew Miss Casey, had her confidence to a degree, and probably had previously succeeded in getting money from her by theft or deception. The scheme was for Kirby to phone Miss Casey and tell her that two plumbers were coming to her apartment to make some repair or other. The ruse was successful, and the men gained entry to the apartment. Once inside, they announced they wanted money, tied Miss Casey up, took some money and left. Craig returned to Kirby with $25.

Several days later, Miss Casey was found dead, in the bathtub, gagged, with her hands tied behind her back, and with a black rope looped around her neck, running behind her to her feet, which were also tied together. The medical evidence was that Miss Casey had died of strangulation, her efforts to free herself having tightened the pull of the rope around her neck, and that she had been dead about two days.

Kirby testified to the making of the arrangement, the departure of Brodie and Craig, and the return of Craig with the $25. Craig testified to the entry by ruse by himself and Brodie, to the disclosure of their true purpose, and to the tying of her hands behind her back, leaving her on the bed. He denied any knowledge of the black rope looped around her neck, running behind her to her tied feet, or to her being left in the bathtub. Both Kirby and Craig had previously been charged, pleaded and given substantial sentences.

Brodie testified that he was present at the planning conversation, left with the others but never entered the apartment. He said he went on to the high school to practice basketball. After having been read, filling in and signing a form to inform him of and to waive his *Miranda* rights, the testimony was that he gave an oral inculpatory statement in his mother's presence. Brodie and his mother both testified that he refused to give any statement and that he gave none. There is no dispute that he refused to give a written statement.

In rebuttal, the State produced a witness who had been the victim of an earlier robbery in the same general area, who identified Brodie as a participant in that robbery, and that he had been tied up in exactly the same fashion as Miss Casey, and with the same kind of black rope. This evidence was received for limited purposes and the jury were so instructed.

As is inevitable in any trial, there were conflicting bits of testimony, aside from items going to the credibility of particular witnesses. Thus, there were police photos taken at Miss Casey's apartment, showing the marks of ripple soled shoes. Craig and Brodie denied that either had worn that kind of shoe. An eyewitness testified to seeing three males, not two, entering the apartment building together, and later leaving.

Nonetheless, reviewing the evidence as a whole, it shows that there was proof sufficient to warrant a reasonable jury rationally to find beyond a reasonable doubt that despite his denial, Brodie had voluntarily made the oral statement, had in fact entered Miss Casey's apartment by ruse, along with Craig, had in fact participated, that he was the one who tied the black rope from Miss Casey's neck to her feet and placed her in the bathtub, that the taking of the money was both by violence and by placing Miss Casey in fear, and that her death "ensued".

■ The act of tying up a victim is an act of violence, by definition. It is both an assault and a battery. It is trespass to the person "vi et armis"–with force and arms. Such an act is quite unlike the situation in *Tuberville v. Savage*, 86 Eng.Rep. 684 (Kings Bench, 1669). In that case, the defendant claimed provocation by the plaintiff in that plaintiff had put his hand on his sword and said: "If it were not assize time, I would not take such language from you." The judgment was that since it *was* assize time, plaintiff's conduct and statement were not an assault amounting to provocation. The plaintiff said he would not assault the defendant, "the Judges being in town", thus the element of intent was lacking.

Evidence of the tying up of the victim is sufficient evidence of the use of violence in connection with the taking of the money, and so the taking is robbery. It is also evidence, together with other circumstances, to show that the victim was put in fear. The act of tying up a victim of advanced age and departing, so that the victim (whether left on the bed or in a bathtub) is unable to free herself is sufficient evidence from which a reasonable jury could rationally find beyond a reasonable doubt that the victim was put in fear. Fear is a state of mind, usually found by inference from the facts and circumstances proved, particularly since the victim, having died as a direct consequence of being tied in the fashion she was, could not provide direct testimony at trial of her state of mind.

This case, then, is much closer to *U.S. ex rel. Dorey v. N.J.*, 560 F.2d 584 (CA 3, 1977) than any other. In that case defendants were tried and convicted of two charges: breaking and entering with intent to steal, and with larceny of a safe. The evidence was that a witness had seen two men tugging at the safe in the office. He so informed another who went to call the police. When the police arrived, they found the safe outside the building near the front steps, with scrapings along one side. The slate steps were freshly chipped, and particles of the paint from the safe were found there. Defendants' car was found at the scene with an emptied trunk (no spare tire or tools), and two pairs of gloves and a flashlight in the glove compartment. The gloves were wet, and there was considerable dew on the ground. The gloves carried chips of paint from the safe. Entry to the building had been forcible, suggesting the use of a pry bar or similar tool, but no such tool was found at the scene. There was evidence that more than an hour had elapsed from when the first observation was made to when the police arrived.

In its charge to the jury, the trial court did not instruct it on the elements of the very offenses charged, taking the position that it was reasonable to infer that someone had broken and entered and taken out the safe. The issue for the jury was defined in terms of whether it was defendants, or some others, who had done so, emphasizing that the burden to so prove was on the State and that defendants were not obliged to produce any evidence. A request to charge on the elements of larceny and of breaking and entering was refused.

On the federal § 2254 proceeding, the trial judge allowed the writ. On appeal, this ruling was reversed. The decision is well worth reading for its clear demarcation of the scope of federal habeas review as well as the statement of the applicable test, which is that the burden in a case like this is even greater than the showing required to establish plain error on direct appeal.

Here, as in *Dorey*, the issue was whether Brodie was there at the scene at all. If the jury were left with a reasonable doubt on this issue, it was obliged to acquit on both counts, on both the felony–murder and robbery charges.

If he were there, the aggregate evidence adduced showed a robbery and a death that "ensued" from a robbery, i. e., felony murder. There was no evidence from which common law murder, whether of the first or second degree, or of manslaughter, could have rationally been found by a reasonable jury.

Since there was no evidence from which a verdict on those offenses could have been based, there was no deprivation of either due process or of the right of jury trial in denying the request to instruct the jury on the law applicable thereto.

■ Two other points are worth noting. One is the decision in *State v. Powell*, 84 N.J. 305, 419 A.2d 406 (1980), briefly reported at 106 N.J.L.J. 93 (July 31, 1980). That decision evidently ruled that where the charge tried is common law murder, the trial judge is obliged to instruct the jury on voluntary manslaughter even though not requested. In the first place, the case did not involve felony–murder, but common law murder. In the second place, the rule announced was not stated to be retroactive, and so is presumed to be prospective only. It reflects, if anything, a change in State law, not in federal law, and may provide Brodie with a basis for seeking post–conviction relief in the State courts under N.J. Court Rule R. 3:22. Until that relief has been exhausted, this court cannot consider the point under 28 U.S.C. § 2254.

■ The other point is that for nearly 20 years, from *State v. McGrath*, 17 N.J. 41, 110 A.2d 11 (1954) to *State v. Saulnier*, 63 N.J. 199, 306 A.2d 67 (1973), the law of New Jersey did not allow a jury presented with the trial of an indictable offense to return a verdict on a lesser included offense that was not indictable. The commonest example was the indictment for atrocious assault and battery, N.J.S. 2A:99–1, a high misdemeanor. The difference between simple assault and battery, N.J.S. 2A:170–26 and atrocious assault and battery is that in the latter a maiming or wounding was an essential element to be shown in addition to the assault and battery itself.

In the 1952 revision of former N.J.R.S. Title 2 into N.J.S. Title 2A, the legislature had downgraded simple assault and battery from an indictable misdemeanor to a non–indictable disorderly act. *State v. Maier*, 13 N.J. 235, 253, 99 A.2d 21 (1953) upheld the constitutionality of the downgrading, and the provision for trial in municipal court rather than in county court.

Before the downgrading, it had been customary practice in such cases to draft the indictment in two counts, one for the atrocious charge and the other for the simple charge. In *State v. McGrath*, 17 N.J. 41, 110 A.2d 11 (1953) and *State v. Chiarello*, 17 N.J. 36, 109 A.2d 803 (1954) the Supreme Court ruled that a county court lacked jurisdiction to enter judgment on the disorderly conduct charge as downgraded, and could only consider guilt or not on the charge of atrocious assault.

With this pronouncement on the law, it became common trial strategy for a defendant facing a charge of atrocious assault to take the stand and admit the occurrence of the incident, but under circumstances showing only simple assault and not atrocious assault. Some number of acquittals ensued, with no means to proceed in municipal court on the simple assault charge in view of the one–year statute of limitations, N.J.S. 2A:169–10.

Thus, even though the essential elements of a simple assault charge are necessarily included in a charge of atrocious assault, no

**626**

instruction on the lesser offense could be given and no verdict on it could be returned. Defendants were free to testify to simple assault and thereby gain an acquittal on the serious charge. Because of the short statute of limitations on the lesser offense, there was a good likelihood of going scot free on the admitted simple assault as well.

*State v. Saulnier,* 63 N.J. 199, 306 A.2d 67 (1973) changed that. It involved a drug charge rather than an assault charge, but the principle was the same. Some drug offenses were indictable, others (lesser included) were disorderly conduct and not indictable.

In *Saulnier* the Supreme Court recognized the error of *McGrath* and *Chiarello* in grounding their ruling on the statutory jurisdiction of the County Courts. It noted that all indictments are returned to the Superior Court, which has original general jurisdiction *in all causes,* a constitutional grant provided for *in N.J.Const.* 1947, Art. 6, sec. 3, par. 2, which no legislation could reduce, and that allocation of indictments to the County Courts for trial was an administrative, not a jurisdictional matter.

Since that decision, the trial of an indictable offense may result in an acquittal of that charge, but in conviction of a lesser included offense which is not indictable at all.

But *Saulnier* only erased the erroneous rule on jurisdiction. It did not alter the widely accepted rule that instructions on lesser included offenses should be given *where the evidence warrants it.* It does not say, nor does any decision say, that a defendant on trial for burglary is automatically entitled to an instruction on malicious injury to property, a disorderly act under N.J.S. 2A:170–36, merely because he broke a lock in making his unlawful entry.

In sum, this is a case in which the evidence was not such as to support a verdict on common law murder, of any degree, or of manslaughter. The issue was whether Brodie was present and participating. If there were a reasonable doubt on that issue, acquittal was called for. If he was found to be present and participating, beyond a rea-

sonable doubt, there was nothing in the evidence to support a verdict of common law murder or manslaughter. The felony–murder statutes are designed to treat as murder that which would be an unforeseen or accidental death, and to classify it as first degree murder, when the death "ensues" from another specified crime, such as robbery. The instructions having been proper on the elements of robbery, and on felony–murder, and the evidence being sufficient to conclude that a reasonable jury could rationally find the elements to have been proven beyond a reasonable doubt, the petition must be denied.

One final word. In a period of more than 7 years, this is the first § 2254 petition presented for the prisoner by the N.J. Public Defender's Office that the court is aware of. The 1967 law creating that office, after some 3 years' experimental work in Essex County after *Gideon,* expressly lists as a duty that "representation for indigent defendants (a) may be provided in any Federal Court in any matter arising out of or relating to an action pending or recently pending in a court of criminal jurisdiction of this State"—an assignment clearly embracing a § 2254 petition. The N.J. Public Defender, despite bugetary constraints, is to be complimented for having discharged that duty, and for having done so well, in this proceeding.